THIRD DIVISION
September 20, 2006

No. 1-04-1981

| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 01 CR 373 |
| | ) | |
| LAKISHA WOODARD, | ) | Honorable |
| | ) | Dennis A. Dernbach, |
| Defendant-Appellant. | ) | Judge Presiding. |

MODIFIED UPON DENIAL OF REHEARING

JUSTICE GREIMAN delivered the opinion of the court:

Defendant Lakisha Woodard appeals from her convictions for the first degree murder of Orlando Patterson and solicitation to commit murder and her sentence to consecutive terms of 45 years and 20 years in prison. For the reasons that follow, we affirm.

Defendant was initially indicted for the first degree murder and the solicitation of the murder of Patterson. She was tried separately but simultaneously by a jury along with her codefendant, Marlon Porter.

At trial, Harriet Alexander, the victim's aunt, testified that Patterson was 12 years old in November 2000, and that on the evening of November 10, he and other children were playing outside her building at 5931 South Elizabeth Street. At the time, Patterson was wearing a black jacket and black and gray gym shoes. Alexander heard a gunshot,

ran outside, and discovered that Patterson had been shot. Patterson was taken to the hospital in an ambulance and later died there.

DaShaun Smith testified that in October 2000 he was a student at Dunbar High School in Chicago. On the afternoon of October 24, Smith went to Copernicus Elementary School to meet his friend Ronald. Smith and Ronald began to scuffle and bumped into a white Pontiac Bonneville that was parked on the street. A woman, whom Smith identified as defendant, got out of the car and began yelling and cursing at the two boys. Smith responded in kind, prompting defendant to place him in a choke hold. While Smith and defendant were struggling, two other women approached and began hitting Smith about the face and head. At one point, defendant wielded a cane in a menacing manner; Smith grabbed hold of the cane and the two wrestled over it. Smith's sister Joanna soon after arrived and broke up the fight.

As Smith left the scene, he met two police officers who transported him to the station and asked him about the altercation. He answered their questions and went home. After Smith arrived home, his friend Chris came over and spoke with him about his sister Joanna. Smith further testified that, at the time of Patterson's shooting on November 10, he was in the vicinity of 59th Street and South Racine Avenue and had recently walked past Alexander's building on Elizabeth Street. That evening, he was wearing a black jacket with yellow stripes, and described himself as having a build and hairstyle similar to those of Patterson.

Joanna Smith testified that on the afternoon of October 24, 2000, she saw her brother DaShaun fighting with defendant and two other women outside Copernicus and

attempted to help him. One of the unidentified women grabbed Joanna while the other blocked her path, so she brandished a screwdriver and poked at them. The women released her and she left the scene, DaShaun having told her he did not need her help. Joanna proceeded to her mother's home to tell her what had happened. Fearing a reprisal from defendant and the other women, Joanna later purchased a box cutter to protect herself. Joanna later saw one of the women she had fought with near a convenience store at 60th and Loomis. Joanna entered the store and defendant and the other women followed her inside. Defendant was holding a metal baseball bat and proceeded to strike Joanna several times. A friend of Joanna's attempted to restrain defendant and was similarly beaten. Defendant then pinned Joanna against the meat counter; Joanna grabbed the box cutter from her pocket and swung it in defendant's direction, cutting her face in the process. Defendant and the other women fled the store. The police were called and Joanna remained at the store to answer their questions.

Joanna later spoke with detectives on November 15, 2000, and was shown comparison photographs of her brother DaShaun and Patterson. Detectives also showed her a photograph of defendant, whom Joanna tentatively identified as the individual who assailed her on October 24.

Assistant State's Attorney (ASA) Nancy Galassini testified that in November 2000 she was assigned to the case of Patterson's murder and that on November 19, she and supervising attorney Kathy Lanahan interviewed defendant, who had been in police custody on suspicion of the murder since November 16. Galassini and Lanahan

3

informed defendant of their offices and advised her of her Miranda rights.  Galassini and Lanahan spoke with defendant about Patterson's murder, and defendant agreed to have her statement memorialized on videotape.

The videotape, in which defendant admitted her involvement in Patterson's murder, was published to the jury.

On cross-examination, ASA Galassini stated that detectives had questioned defendant several times in the 48 hours she had been in custody prior to her interview with Galassini.  She also stated that defendant did not agree to appear on videotape until after she had already given a statement.  Defendant told Galassini that she had been provided food and drink and had been allowed to use the bathroom.

Araminta Alexander, Harriet's daughter, testified that in the evening of November 10, 2000, she and her cousins, including Patterson, were playing in front of her mother's house.  A black car with tinted windows drove by at high speed on Elizabeth Street.  Approximately five minutes later, an individual dressed all in black approached and shot Patterson in the back.  Patterson fell to the ground, and the assailant walked away along 59th Street.  On November 19, 2000, Alexander viewed a lineup at the police station and identified codefendant Porter as having a similar build (tall and slim) and wearing identical shoes to the individual who shot Patterson.  She also tentatively identified codefendant in court as the individual who shot Patterson.

Ronald Trice testified that in November 2000, he was 12 years old and resided at 5957 South Elizabeth Street.  He had been friends with both Patterson and DaShaun Smith and described them as having very similar appearances at that time.  On the

4

evening of November 10, Trice was outside playing with Patterson, Alexander and several other children when a man dressed all in black approached from a nearby alleyway and shot Patterson in the back. Trice and others attempted to chase the man, who ran toward Racine along 59th Street. The assailant got into a car, which was gray in color and had tinted windows and stripes along the rear windshield, which drove away along Racine. On November 19, Trice identified codefendant Porter in a police lineup as the gunman, whom he had described as tall with a medium build.

Detective Robert Lanihan testified that in November 2000, he was assigned to investigate the murder of Patterson, and he received a phone call from an anonymous source who had information concerning the case. After receiving the call, Lanihan and his partner sought defendant for questioning. On November 15, Lanihan interviewed DaShaun and Joanna Smith and afterward issued a stop order for defendant.

Detective J. Breen testified that he had been assigned to investigate Patterson's murder and that on November 18, 2000, he and his partner took codefendant Porter into custody. During booking, Porter described himself as 6 feet 3 inches tall and weighing 175 pounds.

Officer Russell White testified that on October 24, 2000, he was assigned to investigate a battery in the 7th District. He and his partner proceeded to St. Bernard's Hospital, where they interviewed defendant, who alleged that she had been the victim of a battery and was being treated for a laceration on her face. Defendant could not identify her assailant and gave several conflicting accounts of how she had come sustain her injury. White took her report and left defendant with his contact information

in the event that she would need to speak with him further.

Pacita DeJesus testified that she was working as a nurse at St. Bernard's on October 24, 2000, and that she treated defendant for a laceration to her face. Defendant had minimal bleeding, no visual disturbances, and appeared lucid.

Detective John Halloran testified that he was assigned to investigate the Patterson murder on November 10, 2000, and that he sought defendant for questioning based on an anonymous tip. Defendant contacted police and submitted to interviews on November 16. Halloran advised defendant of her Miranda rights, which defendant indicated that she understood and agreed to waive. Based on defendant's conversations with Halloran and other detectives, police sought the pistol used in Patterson's murder at defendant's mother's home and at an address on South Loomis. In a conversation that took place on November 18, Halloran again advised defendant of her Miranda rights, which she acknowledged and agreed to waive, and confronted her with the facts that police had codefendant Porter in custody and were questioning him and that DaShaun and Joanna Smith had identified her as the individual that had assailed them on October 24. Defendant proffered a statement in which she admitted to asking Porter to kill DaShaun and Joanna. She further related that while she was fighting with DaShaun on the afternoon of October 24, a "skinny kid" stole her car keys, and that during a follow-up doctor's appointment concerning her face laceration on November 1, she resolved to have DaShaun and Joanna killed. Defendant thereafter sought out information as to where DaShaun and Joanna lived and spent their free time, and showed Porter their neighborhood and indicated her desire that he kill them both.

6

Defendant provided Porter with a pistol and a car – a gray Isuzu – with which to carry out the murders.

On cross-examination, Detective Halloran stated that after his conversation with defendant on November 16, he did not indicate to her that she was free to leave the police station, but informed her that he intended to conduct some additional investigation and that she should ask the other officers in the station in the event that she needed anything. Early the next morning, Halloran's shift ended, he was not on duty the following day, and he returned to duty the afternoon of November 18, and he was not aware of defendant's movements during his absence. By the time that defendant tendered her statement, which was the third time that Halloran interviewed her, she had been in police custody for approximately 50 hours. In that time, she had been fed and allowed to use the restroom.

Detective Daniel McNally testified that on November 17, 2005, he interviewed defendant and advised her of her <u>Miranda</u> rights, which defendant acknowledged and agreed to waive. Defendant related that after her altercation with Joanna Smith on October 24, an individual known as "Boo" transported her to the hospital and may have been involved in the subsequent shooting of Patterson. McNally eventually identified "Boo" as Joseph Wright but was not able to locate him for questioning. Defendant also mentioned an individual to whom she referred as "Tay," but detectives were not able to locate him either. She also implicated other individuals, but refused to tender any identifying details.

Defendant further related to McNally that her Pontiac Bonneville had been taken

7

from her sometime during the afternoon of October 24 and that a family member had recovered the vehicle not far from the Copernicus school. Defendant also related that she had borrowed the Isuzu from a local drug addict. Detectives were able to locate each vehicle, and defendant identified the Isuzu as the one she had borrowed. During his shift, McNally saw to it that defendant was provided with food and was allowed to use the bathroom.

Melissa Nally testified that she was employed by the Illinois State Police as a forensic scientist specializing in firearm identification. The parties stipulated that she was qualified to testify as an expert in that area, and she stated that in March 2004 she examined a bullet that had been recovered from Patterson's body. The bullet's dimensions and characteristics led her to opine that it was a lead, rounded-nose bullet of either a .357 or .38 caliber. The bullet's distinguishing marks, or cannelures, led her to believe that it had been fired from a revolver.

Dr. Scott Denton testified that he was a deputy for the Cook County medical examiner and had performed nearly 2,500 autopsies in that capacity. The parties stipulated that he was qualified to testify as an expert in the field of forensic pathology. Denton stated that he performed the autopsy on Patterson's body on November 11, 2000, and determined that the cause of death was a gunshot wound to the upper back. Denton recovered the bullet from just underneath the skin covering Patterson's sternum and estimated that was between a .32 and .38 caliber. He also surmised from the condition of Patterson's skin and clothing that he had been shot at close range.

Detective Timothy Nolan testified that in November 2000 he was assigned to

investigate the Patterson murder and that on the evening of November 17 he interviewed defendant. Nolan advised defendant of her <u>Miranda</u> rights, which she acknowledged, and she agreed to speak with him. When questioned about the weapon used in Patterson's murder, defendant indicated that she believed the gun had been dropped in an alleyway. She identified codefendant Porter as Patterson's assailant and indicated that there were other individuals with information concerning the offense, but refused to name them.

On cross-examination, Detective Nolan could not recall whether he had made any general progress reports as to his conversation with defendant and stated that defendant had told him that witnesses to the murder informed her that Porter had shot Patterson.

The State and defendant both rested.

At the jury instruction conference, defense counsel requested that the circuit court issue an instruction that it could find defendant guilty of second degree murder on the basis of provocation by Joanna Smith, who defendant alleged in her videotaped statement caused her to believe she was acting in self-defense. Defendant argued that Smith had aroused intense passion by inflicting the cut to defendant's face, which required numerous stitches and plastic surgery. The circuit court denied the request, finding that the 17 days that elapsed between the altercation involving defendant and Smith on October 24, 2000, and the shooting of Patterson on November 10, 2000, militated against a provocation defense. Counsel also requested an instruction that defendant could not be found guilty of both the murder of Patterson and the solicitation

thereof. The court denied the request, stating that murder and the solicitation of murder constitute two separate offenses.

Also during the instruction conference, defense counsel requested that, in issuing Illinois Pattern Jury Instructions, Criminal, No. 6.02(A) (3rd ed. 1992), the circuit court issue a version that did not include the name of the intended victim of the solicitation charge because the charging indictment did not specify the name of the intended victim. The prosecutor requested that the court issue two instructions, one naming Joanna Smith as the intended victim and the other naming DaShaun Smith as the intended victim. The court ultimately issued the instruction that did not include the names of the intended victims.

The jury found defendant guilty of both first degree murder and solicitation of murder.

At the sentencing hearing, defendant's presentence investigation report indicated that she had attempted suicide while in custody awaiting trial and that she had been prescribed psychotropic medications to treat symptoms of depression in that same period. There was no indication that she had undergone a psychological evaluation or that one had been ordered. In aggravation, the State presented the testimony of Cook County jail personnel, who stated that defendant had been disciplined for fighting with her cellmate and for remaining in an unauthorized area, as well as four victim impact statements. In mitigation, defense counsel pointed out that defendant was 20 years old at the time of the offense, that she had no prior criminal record, and that Joanna Smith had injured her, and he sought concurrent sentences for defendant's multiple

10

convictions.

The circuit court sentenced defendant to 45 years for murder and 20 years for solicitation, the two terms to be served concurrently. As a result of her conviction for the murder of a 12-year-old victim, defendant was required to register as a sex offender pursuant to the Sex Offender Registration Act (730 ILCS 150/3 (West 2004)) (Registration Act), and Sex Offender and Child Murderer Community Notification Law (730 ILCS 152/110 (West 2004)) (Notification Law). Defendant now appeals.

Defendant initially contends on appeal that she was denied effective assistance of counsel when her attorney failed to file a motion to suppress her inculpatory statement to police. She argues that such a motion likely would have succeeded and altered the outcome of her trial because the investigating officers detained her for an unreasonable amount of time without conducting a hearing to determine whether there was probable cause to keep her in custody. The State responds that the length of defendant's detention was a matter of her own doing and was not unreasonable, and that a motion to suppress would have therefore failed.

In order to prevail on a claim of ineffective assistance of counsel, a defendant must demonstrate that counsel's performance was objectively deficient and that the deficient performance led to substantial prejudice against the defendant. Strickland v. Washington, 466 U.S. 668, 687, 80 L. Ed. 2d 674, 693, 104 S. Ct. 2052, 2064 (1984). Where a reviewing court may dispose of an ineffective assistance claim on the prejudice prong, it should do so, and it need not examine the individual quality of counsel's performance. Strickland, 466 U.S. at 697, 80 L. Ed. 2d at 699, 104 S. Ct. at 2069. In

11

assessing whether a defendant suffered substantial prejudice, a reviewing court considers whether the result of the relevant proceeding would have been different but for counsel's performance. Strickland, 466 U.S. at 694, 80 L. Ed. 2d at 698, 104 S. Ct. at 2068.

When alleging ineffective assistance of counsel, a defendant must overcome the presumption that the attorney's conduct will be considered a matter of trial strategy. People v. Giles, 209 Ill. App. 3d 265, 271 (1991). The decision to file a motion to suppress and the grounds upon which to argue for suppression are generally considered matters of trial strategy, and in order to show that such a decision amounted to ineffective assistance, the defendant must demonstrate that the trial outcome would have differed had such a motion succeeded. People v. Rodriguez, 312 Ill. App. 3d 920, 925 (2000). Neither mistakes in trial strategy nor another attorney's hindsight is sufficient to demonstrate that trial counsel was objectively incompetent. People v. Young, 341 Ill. App. 3d 379, 383 (2003). In general, an attorney's decision involving a matter of trial strategy will not support a claim of ineffective assistance. People v. Simmons, 342 Ill. App. 3d 185, 191 (2003).

The record indicates that defendant was present at the police station for approximately 50 hours prior to giving a statement to detectives that implicated herself and her codefendant in the murder of Patterson. During that time, she gave several other statements concerning the possible involvement of other offenders and witnesses. No probable cause hearing was held until approximately 80 hours had passed. Defendant argues that this delay was unreasonable and violated her constitutional right

12

to a probable cause hearing and therefore militates against the admission of her inculpatory statement.

Pursuant to the fourth amendment, a defendant arrested without a warrant is entitled to a probable cause hearing in order to justify any prolonged detention. People v. Groves, 294 Ill. App. 3d 570, 577 (1998). The Supreme Court has held that a hearing to establish probable cause within 48 hours of a defendant's warrantless arrest generally passes constitutional muster. County of Riverside v. McLaughlin, 500 U.S. 44, 56, 114 L. Ed. 2d 49, 63, 111 S. Ct. 1661, 1670 (1991). Where no hearing is held within 48 hours, the State must show some exigence or emergency circumstances justifying the delay. McLaughlin, 500 U.S. at 57, 114 L. Ed. 2d at 63, 111 S. Ct. at 1670. However, the Supreme Court has not prescribed a specific remedy for the State's failure to make such a showing where a McLaughlin violation is apparent. Powell v. Nevada, 511 U.S. 79, 84-85, 128 L. Ed. 2d 1, 7-8, 114 S. Ct. 1280, 1283-84 (1994).

Defendant contends that because she was detained for nearly 80 hours without a probable cause hearing, and because no extraordinary circumstances existed to prevent the State from conducting such a proceeding (resulting in a McLaughlin violation), a motion to suppress the statements she made to the detectives and assistant State's Attorney would have succeeded and the statements would have been excluded. We disagree.

The Illinois Supreme Court has recently held that the admissibility of a defendant's statement hinges on whether it was voluntary and adopted the view that

13

prolonged detention is only one factor in determining whether an inculpatory statement was given voluntarily and should be admitted or suppressed; it is not dispositive. People v. Willis, 215 Ill. 2d 517, 530-31 (2005). The court stated that its inquiry was whether the benefit of excluding a putatively voluntary statement in order to deter police from violating McLaughlin would outweigh the social costs of such a rule. Willis, 215 Ill. 2d at 531-32. The court concluded that the benefit of a strict exclusionary rule does not outweigh its social costs, reasoning that unduly detained defendants have civil remedies available to them under federal law (42 U.S.C. §1983 (2000)), that police need some latitude in conducting their investigations with the limited resources available to them, and that triers of fact are not likely to ignore the duration of a detention preceding the issuance of a statement. Willis, 215 Ill. 2d at 532. The court resolved that, while undue delay may be considered, the decisive test of a statement's admissibility is whether it was given voluntarily, *i.e.*, "whether the inherently coercive atmosphere of the police station was the impetus for the confession or whether it was the product of free will." Willis, 215 Ill. 2d at 535, citing People v. Morgan, 197 Ill. 2d 404, 437 (2001).

In assessing whether a defendant's statement was voluntary, courts consider the totality of the circumstances, including the defendant's age, intelligence, education, experience, and physical condition at the time of the detention and interview; the duration of the interview; whether Miranda warnings were issued; whether the defendant suffered any physical or mental abuse; and the legality and duration of the detention. People v. Gilliam, 172 Ill. 2d 484, 500-01 (1996).

The record indicates that defendant was 20 years old at the time she gave her

14

statement, did not suffer from any mental or physical affliction, and that her conversations with detectives did not last for inordinate amounts of time. The detectives' testimony also indicates that defendant was informed of her Miranda rights on several occasions and that she was provided with food, drink, and use of a restroom throughout her time in custody. We believe that these factors outweigh the duration of her detention and favor a finding that her inculpatory statements are voluntary.

We find the circumstances of this case analogous to those of this court's holding in People v. Sterling, 357 Ill. App. 3d 235 (2005). In Sterling, the defendant in a murder case was held in police custody for 96 hours before the State conducted a probable cause hearing. During that time, the defendant made several voluntary statements to detectives. Those statements often differed in their versions of the events and circumstances surrounding the murder and the defendant's own movements in the days leading up to its commission. The detectives investigated each lead the defendant gave them, only to find they were unsubstantiated, and the defendant eventually gave a statement implicating himself in the murder. Sterling, 357 Ill. App. 3d at 249-50.

At the beginning of trial, defense counsel did not file a motion to suppress the defendant's inculpatory statement, but later sought suppression during the jury instruction conference based on the length of the defendant's detention. The circuit court denied the motion, finding that the defendant had begun volunteering statements to police within a day of his arrest. The defendant was convicted and sentenced to an extended prison term. Sterling, 357 Ill. App. 3d at 246. On appeal, the defendant argued that he was denied the effective assistance of counsel when his trial attorney

15

failed to file a motion to suppress his statement on the grounds that his lengthy detention without a probable cause hearing was unlawful. This court considered the circumstances of the defendant's detention, found that she had given her inculpatory statements voluntarily within 24 hours of her arrest, and determined that a motion to suppress would not have been successful and thus would not have altered the outcome of the trial. Sterling, 357 Ill. App. 3d at 252-53.

We reach the same conclusion here. We have already determined that defendant's statement implicating herself in Patterson's murder was voluntary. Additionally, we note that defendant began offering voluntary statements to detectives soon after she arrived at the police station. Those statements, while they may not have indicated her direct involvement in the murder, at the very least indicated her detailed knowledge of the circumstances surrounding it. Some 22 hours after her initial interview with Detective Halloran, defendant told Detective Nolan that her co-defendant Porter shot and killed and Patterson. The detectives acted on the information defendant provided them and investigated the validity of the information. When defendant's initial statements did not withstand further scrutiny, the detectives sought clarification and revision. Defendant's changing stories and dead-end leads only perpetuated her own detention, as they necessitated further investigation and only increased the detectives' suspicion of her involvement in the murder. Based on this record, we can only conclude that the circuit court would not have granted a motion to suppress defendant's statement, that defendant's trial was not prejudiced as a result, and therefore that defendant was not deprived of the effective assistance of trial counsel.

Defendant next contends that the circuit court erred in failing to instruct the jury on second degree murder. She argues that she was denied due process where there was evidence in the record supporting a finding that her actions were the result of provocation and would have dictated a conviction on the lesser offense of second degree murder. The State counters that the circumstances surrounding the murder of Patterson dictate against a finding of provocation.

The decision whether to issue a jury instruction is within the discretion of the circuit court, and reviewing courts will not reverse such a decision absent an abuse of that discretion. People v. Eason, 326 Ill. App. 3d 197, 205 (2001). Where there is evidence that, if believed by the jury, would reduce an alleged count from first degree murder to a lesser one, a defendant's requested instruction to that effect must be given. Eason, 326 Ill. App. 3d at 205. However, the defendant seeking such an instruction bears the burden of proving that at least some evidence exists supporting the lesser offense. Eason, 326 Ill. App. 3d at 205.

Under the Illinois Criminal Code of 1961 (the Code), a person is guilty of first degree murder where he or she kills an individual without lawful justification and either intends to kill or to do great bodily harm to that individual or another. 720 ILCS 5/9-1(a)(1) (West 2004). In order to sustain a conviction for first degree murder, the State need only show that a defendant's criminal acts contributed to causing the victim's death, even if those acts were not the sole and immediate cause of death. People v. Crane, 333 Ill. App. 3d 768, 773 (2002).

A person commits second degree murder when he or she intentionally causes

17

the death of another and the person is acting either under a sudden and intense passion resulting from serious provocation by the victim, or under the belief that the circumstances surrounding the killing would justify or exonerate its commission. 720 ILCS 5/9-2(a)(1), (a)(2) (West 2004). The Code defines "serious provocation" as "conduct sufficient to excite an intense passion in a reasonable person." 720 ILCS 5/9-2(b) (West 2002). A defendant who is on trial before a jury for first degree murder and seeks conviction for the lesser offense of second degree murder must prove either of the mitigating factors by a preponderance of the evidence before he or she can be found guilty of the lesser offense. 720 ILCS 5/9-2(c) (West 2004).

Illinois courts recognize four categories of provocation sufficient to warrant an instruction on second degree murder in trials for first degree murder. Those categories are mutual quarrel or combat, substantial physical injury or assault, illegal arrest, or adultery with one's spouse. People v. Nitz, 319 Ill. App. 3d 949, 957 (2001), *vacated & remanded on other grounds*, 219 Ill. 2d 400 (2006). Sufficient provocation may be found where there was a serious and highly provoking injury inflicted on the defendant by the person subsequently killed and the killing results from a sudden, violent impulse of passion believed to be irresistible, but not if there is an interval between the assault or provocation and the killing sufficient for the voice of reason and humanity to be heard. People v. Smith, 404 Ill. 350, 354 (1949).

Here, defendant argued at the jury instruction conference that the altercation between herself and Joanna Smith on October 24, 2000, resulted in a serious injury in the form of a severe cut to her face, which required several stitches and reconstructive

surgery. She relayed in her statements to detectives that her encounters with DaShaun and Joanna Smith prompted her to seek their demise and to employ Marlon Porter to that end. Her reaction led to the shooting death of Patterson, a child defendant did not know and who had in no way offended her, on November 10, 2000, 17 days after her confrontations with the Smiths.

On these facts, we find no evidence of provocation sufficient to require a jury instruction on second degree murder. Seventeen days elapsed between the date of defendant's injury and Porter's mistaken shooting of Patterson, more than enough time for the voice of reason and humanity to be heard. While defendant may indeed have experienced sudden and intense passion as the result of her injury at the hands of Joanna Smith, the lapse of more than two weeks between the fight and Patterson's murder, her enlistment of Porter's aid in her plan to retaliate, and the resulting death of an uninvolved party indicate only deliberate, calculated revenge, which can only be punished as first degree murder. See Smith, 404 Ill. at 354. Accordingly, we find that the circuit court did not abuse its discretion in denying defendant's request for a jury instruction on second degree murder.

Defendant next contends that we should vacate her conviction and sentence for solicitation of murder where she was also convicted and sentenced for first degree murder on the theory of accountability, and where the indictment does not specify the intended victim of the solicitation count. She argues that the offense of solicitation is inchoate in her conviction for first degree murder on a theory of accountability. The State responds that defendant solicited the murder of two specific victims but was also

guilty in orchestrating the death of a separate victim and thus should stand convicted and sentenced for two separate crimes. We agree.

Under the Criminal Code, a person commits the offense of solicitation of murder when he or she has the intent that the offense of first degree murder be committed and commands, encourages, or requests another to commit the offense. 720 ILCS 5/8-1.1(a) (West 2004). Illinois law specifies that no person may be convicted of both the inchoate and the principal offense. 720 ILCS 5/8-5 (West 2004). Illinois courts have held that when a person solicits a murder and his agent actually commits the offense, the solicitor cannot be convicted of both solicitation of murder and first degree murder on accountability theory, and that convictions and sentences for solicitation in such an instance must be vacated. People v. Sims, 315 Ill. App. 3d 518, 521 (2000). However, where an individual solicits another person to commit murder, but the murder is not committed, the offense of solicitation is complete once the request has been made. Sims, 315 Ill. App. 3d at 521. Where a defendant asks one person to commit murder, and that person refuses but another person agrees and carries out the requested deed, the defendant may stand convicted of solicitation in the first instance and convicted of first degree murder in the second scenario. Sims, 315 Ill. App. 3d at 521-22.

The situation before us is unique in that defendant solicited Marlon Porter to commit the murder of two specific individuals, Joanna Smith and DaShaun Smith, but her solicitation led to the murder of someone else, Orlando Patterson. Had defendant solicited Porter to commit the murder of Patterson, the offense of solicitation would obviously have been inchoate in the first degree murder count. However, the offenses

20

charged here had separate victims; defendant sought the murder of Joanna and DaShaun Smith, but her request led to the first degree murder of Patterson. Defendant's request to Porter to kill the Smiths completed the office of solicitation of murder. Porter's subsequent shooting and killing of Patterson constituted the first degree murder of Patterson, not Joanna or DaShaun Smith. Because the two counts on which defendant was tried had separate victims, we find that the solicitation count was not inchoate in the first degree murder count and that her conviction and sentence for the former should not be vacated.

Defendant argues that her conviction for solicitation should not stand because the State failed to specify whose murder defendant solicited in both the charging indictment and in the jury instructions. We believe this argument has some merit, but does not warrant reversal under the circumstances presented here.

A defendant has the fundamental right to be informed of the nature and cause of the charges brought against him or her so that he or she may prepare a defense and so that the charges may serve as a bar to subsequent prosecution arising out of the same conduct. People v. Bishop, 218 Ill. 2d 232, 243 (2006). Under Illinois law, a charging instrument must indicate that the State intends to treat the conduct of the defendant – where it is comprised of several distinct yet very closely related acts – as multiple acts in order for multiple convictions to be sustained. People v. Crespo, 203 Ill. 2d 335, 345 (2001). In order to sustain multiple convictions for closely related acts, the State must specify different acts in the charging instrument and argue them as separate acts to the jury. See People v. Schrader, 353 Ill. App. 3d 684, 697-98 (2004).

From this record, we believe it was apparent to defendant and to the jury that the State sought to prosecute and convict defendant for both solicitation of murder and first degree murder. While the indictment for solicitation and its corresponding jury instruction do not specify whose murder defendant sought Porter's aid in committing, it was clear from the evidence and from the prosecutor's arguments that defendant planned and requested Porter's help in killing Joanna and DaShaun Smith. While the State should have specified the names of the intended victims in the indictment for solicitation, we find that defendant was not prejudicially deprived of notice of the charges against her. While we do not excuse the State's omission, we find it is harmless error and does not warrant reversal in this instance.

Defendant next contends that she was denied due process of law where the circuit court failed to conduct a hearing as to defendant's fitness to stand trial and be sentenced where there were indications that defendant had been prescribed antidepressants and had attempted suicide while in custody awaiting trial, indicating a *bona fide* doubt as to her fitness to stand trial.

Due process bars the criminal prosecution or sentencing of a defendant who is not competent to stand trial. People v. Sandham, 174 Ill. 2d 379, 382 (1996). A defendant is not fit to stand trial if he or she is unable to understand the nature and purpose of the proceedings against him or her or is unable to assist counsel in presenting a defense. People v. Hanson, 212 Ill. 2d 212, 218 (2004). Because it is a violation of due process to convict a defendant who is mentally unfit to stand trial, a trial court has a duty to order a fitness hearing *sua sponte* once facts are brought to the

22

court's attention that raise a *bona fide* doubt as to the defendant's fitness to stand trial or be sentenced. People v. McCallister, 193 Ill. 2d 63, 110-11 (2000). A defendant's fitness refers to his or her ability to function at trial, not his or her competence in other areas. People v. Eddmonds, 143 Ill. 2d 501, 519-20 (1991). Therefore, the mere existence of a mental disturbance or an instance of psychiatric treatment does not necessarily raise a *bona fide* doubt of fitness. Eddmonds, 143 Ill. 2d at 519. Additionally, a defendant may be competent to stand trial even though his or her mind is otherwise unsound. Sandham, 174 Ill. 2d at 388-89.

Courts consider three main factors in determining whether a *bona fide* doubt of a defendant's fitness to stand trial: (1) the rationality of the defendant's behavior and demeanor at trial; (2) counsel's statements concerning the defendant's competence; and (3) any prior medical opinions on the issue of defendant's fitness. Hanson, 212 Ill. 2d at 223. In such a proceeding, the defendant bears the burden of proving facts which give rise to a real, substantial, and legitimate doubt as to his mental capacity to participate meaningfully in his defense and cooperate with defense counsel. Eddmonds, 143 Ill. 2d at 518. Whether a *bona fide* doubt of a defendant's fitness exists is a matter within the discretion of the circuit court. Sandham, 174 Ill. 2d at 382.

Here defendant points out that she had ceased taking her antidepressant medication in April 2004, soon before her trial commenced, because she did not want to appear drowsy or incoherent during trial, and that her presentence investigation report contains two reports of incidents during which she attempted suicide, as well as a report that she attended psychological therapy sessions and anger management seminars on

23

a weekly basis. She argues that such facts raised a *bona fide* doubt of her fitness to stand trial and that the circuit court committed reversible error where it failed to conduct a fitness hearing and instead proceeded to sentencing when those facts became apparent.

No single factor raises a *bona fide* doubt as to a defendant's fitness to stand trial and sentencing; even the fact that a defendant suffers a mental disturbance or requires psychiatric treatment does not necessarily raise a *bona fide* doubt. People v. Walker, 262 Ill. App. 3d 796, 803 (1994). A defendant who has received psyochotropic medications is not presumed unfit to stand trial solely by virtue of having received those medications, and a circuit court is under no duty to *sua sponte* conduct a fitness hearing solely on the basis of the defendant having received such medications. 725 ILCS 5/104-21(a) (West 2004); People v. Mitchell, 189 Ill. 2d 312, 331 (2000). Also, a history of suicide attempts does not by istelf demonstrate that a defendant is unfit to stand trial. People v. Sanchez, 169 Ill. 472, 483 (1996).

On the facts in this record, we find that the circuit court was not remiss in failing to *sua sponte* conduct an inquiry into the issue of defendant's fitness to stand trial and sentencing. There is nothing in the transcripts or accompanying evidence to indicate that defendant's behavior was anything other than interested, rational, and appropriate, nor is there any indication by the court or defense counsel that defendant was unable to understand the nature of the proceedings against her or to assist counsel in her defense. See Hanson, 212 Ill. 2d at 224. Defendant did not disrupt the proceedings by speaking out of turn, and when addressed by the court, she responded appropriately

and coherently. Neither the circuit court, which had the best opportunity to observe defendant's behavior and assess its level of propriety, nor counsel expressed concern over defendant's ability to proceed with trial. Furthermore, there was no medical opinion in the record to indicate anything to the contrary. Defendant's having been on antidepressants, her attempts at suicide, and her attendance at psychological and behavior management sessions, while certainly a cause for concern, do not, we believe, amount to evidence sufficient to sustain a *bona fide* doubt as to her fitness to stand trial and sentencing. Accordingly, we find that the circuit court did not err in this respect.

Defendant next contends that her sentence to a prison term of 45 years for murder was excessive in light of her negligible criminal background, her young age, and her potential for rehabilitation, and that it should be reduced. She argues that the circuit court did not adequately consider these factors in mitigation. We disagree.

A sentencing decision is a matter entirely within the discretion of the circuit court which we will not disturb absent an abuse of that discretion. People v. Rogers, 197 Ill. 2d 216, 223 (2001). It is not this court's function to reweigh the relevant sentencing factors or substitute our judgement for that of the circuit court. People v. Streit, 142 Ill. 2d 13, 19 (1991). A sentence imposed within statutory limits will not be deemed excessive unless it varies greatly with the spirit and purpose of the law or is manifestly disproportionate to the nature of the offense. People v. Fern, 189 Ill. 2d 48, 54 (1999).

Under Illinois law, conviction for the offense of first degree murder carries a sentence of anywhere from 20 years to 60 years in prison. 730 ILCS 5/5-8-1(a) (West 2004). The 45-year sentence imposed by the circuit court here was well within statutory

guidelines.

During the trial sentencing hearing, the circuit court heard ample evidence of defendant's encounters with Joanna and DaShaun Smith, her intended victims, as well as the difficulties she endured while in custody awaiting trial. Defendant's age and lack of previous criminal proceedings were apparent from the presentence investigation report. The circuit judge also explicitly noted defendant's apparent lack of remorse in her videotaped statement (defendant only expressed remorse that someone other than her intended victims had been killed), and stated, "I have considered the potential for rehabilitation, the seriousness of the crime, and other matters appropriate for sentencing."

As defendant's sentence does not offend statutory guidelines, and as there is no indication from the record that the circuit court either failed to consider proper factors or considered improper ones in imposing defendant's sentence, we cannot conclude that defendant's sentence constituted an abuse of judicial discretion.

Defendant lastly contends that she was improperly subjected to the Registration Act and Notification Law in that her conviction for first degree murder had no sexual motivation or component, and that mandatory compliance with those statutes would violate her rights to due process, privacy, and equal protection. She argues that compliance with the statutes is unconstitutional as applied to her because her offense had no sexual component, because she has not been afforded a hearing to determine the propriety of her being labeled a sex offender, because compliance would unfairly restrict her where she could reside and her activities in raising children of her own and

would subject her to mandatory fees without a hearing.

This court has held that the Registration Act and Notification Law do not violate defendants' federal and state constitutional rights. People v. Beard, No. 1-04-2157, slip op. at 9-13 (May 12, 2006); In re Phillip C., 364 Ill. App. 3d 822, 830-831, citing People v. Johnson, 363 Ill. App. 3d. 356, 364-65 (2006) (Wolfson, J., dissenting), *leave to appeal allowed*, 218 Ill. 2d 550 (March 29, 2006); and People v. Fuller, 324 Ill. App. 3d 728, 733 (2001). We see no need to revisit the merits of the statutes as they apply to defendant. However, it is incumbent upon this court to note that the statutes in question, the application of which defendant now challenges, have undergone significant amendments and corrections as of June 27, 2006, which, if in effect at the time of defendant's sentencing, would have rendered her not subject to those laws' provisions.

At the time of defendant's sentencing, the Registration Act required that anyone defined as a "sex offender" pursuant to the statute to register as such with the chief of police in the municipality in which he or she resides or is temporarily domiciled or the sheriff of the relevant county. 730 ILCS 150/3(a)(1), (a)(2) (West 2004). The Act included a definition of "sex offense" as first degree murder when the victim was under 18 years of age and the defendant was at least 17 years old at the time of the offense. 730 ILCS 150/2(B)(1.6) (West 2004). At the same time, the Notification Law required sex offenders, as defined under the Registration Act, to report changes of address or employment with the law enforcement agency having jurisdiction over his or her residence and place of employment. 730 ILCS 152/110 (West 2004). Because

27

defendant was convicted of the first degree murder of a 12-year-old child, and she was herself 20 years old at the time she committed the offense, she was compelled to register pursuant to the statutes as they read at the time of her sentencing.

We are aware of no authority that would invalidate or call into question the relevant definition of "sex offense" as the first degree murder of a person under 18, either on its face or as applied.

However, the Registration Act was recently amended with respect to the definition of a "sex offender" with respect to a defendant convicted of the first degree murder of a victim under 18. The relevant portion of the statute now defines "sex offense" in that regard as first degree murder "when the victim was a person under 18 years of age *** *provided the offense was sexually motivated.*" (Emphasis added.) Pub. Act 94-945, eff. June 27, 2006 (amending 730 ILCS 150/2(B)(1.6)) .

From this record, there is no evidence that the murder of Orlando Patterson was sexually motivated but, rather, was a mistake resulting from defendant's vendetta against Joanna and DaShaun Smith. Accordingly, as the Registration Act now reads, defendant would not be defined as a "sex offender" and would likely not be required to comply with the Registration Act or Notification Law. However, at the time of her conviction and sentencing in 2004, defendant's offense rendered her eligible for mandatory registration under the Act, since she was 20 years old at the time of the murder of Patterson, who himself was 12 years old at the time. Illinois courts are reluctant to apply statutory amendments on a retroactive basis.

"A statutory amendment cannot be given retroactive effect in the absence of a

clear expression of legislative intent to do so." In re Detention of Lieberman, 201 Ill. 2d 300, 321 n.3 (2002), citing Commonwealth Edison Co. v. Will County Collector, 196 Ill. 2d 27, 38-39 (2001). While the Registration Act and Notification Law have themselves been deemed to have retroactive effect (see Malchow, 193 Ill. 2d at 418), there is no indication in the language of the recent amendment that it is to have retroactive effect with regard to the amended definitions of "sex offender" under the Registration Act. It only reads, "This Act takes effect upon becoming law." Pub. Act 94-945, eff. June 27, 2006. Because the amendment became effective only when it was approved on June 27, 2006, we find that it does not apply to defendant, as there is no indication that the amendment is to apply retroactively.

Accordingly, we uphold defendant's mandatory compliance with the relevant provisions of the Registration Act and Notification Law.

For the reasons set forth above, we affirm the judgment of the circuit court and uphold defendant's convictions and sentences.

Affirmed.

QUINN, P.J., and MURPHY, J., concur.