NOTICE

Decision filed 06/03/26. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2026 IL App (5th) 250024-U

NO. 5-25-0024

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

NOTICE

This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Madison County. |
| | ) | |
| v. | ) | No. 23-CF-434 |
| | ) | |
| RICHARD D. MAYOR, | ) | Honorable |
| | ) | Kyle A. Napp, |
| Defendant-Appellant. | ) | Judge, presiding. |

_____

JUSTICE BOLLINGER delivered the judgment of the court.
Justices Hackett and Clarke concurred in the judgment.

**ORDER**

¶ 1    *Held*: Where defendant's *pro se* postconviction petition was frivolous or patently without merit, and no argument to the contrary would have merit, this court grants defendant's appellate counsel leave to withdraw and affirms the trial court's summary dismissal of the petition.

¶ 2    Defendant, Richard D. Mayor, is serving a 60-year prison sentence for first degree murder. He now appeals from the trial court's summary dismissal of his petition for relief under the Post-Conviction Hearing Act (Act) (725 ILCS 5/122-1 *et seq.* (West 2022)). His appointed counsel in this appeal, the Office of the State Appellate Defender (OSAD), has concluded that this appeal lacks arguable merit and, on that basis, has filed with this court a motion for leave to withdraw as counsel (see *Pennsylvania v. Finley*, 481 U.S. 551 (1987)), along with a supporting memorandum of law. Defendant has filed a response, objecting to OSAD's *Finley* motion. Having read OSAD's

1

motion and the accompanying memorandum of law, defendant's response, and the entire record on appeal, this court grants OSAD leave to withdraw as counsel and affirms the judgment of the trial court.

¶ 3                 I. BACKGROUND

¶ 4                 A. Charges

¶ 5      On February 23, 2023, the State filed an information charging defendant with two counts of first degree murder—intentional first degree murder (720 ILCS 5/9-1(a)(1) (West 2020)) and knowing first degree murder (*id.* § 9-1(a)(2)). The charges were brought in connection with the death of Lisa Dunnavant-Polach. The information alleged that defendant had struck the victim with his vehicle. The trial court appointed the public defender as counsel for defendant. On March 16, 2023, a grand jury returned a superseding indictment, substantively identical to the information.

¶ 6                 B. Waiver of Counsel

¶ 7      On March 17, 2023, defendant filed *pro se* a motion to represent himself. The motion alleged that defendant did not have money to hire an attorney and that he did not "trust [his] life" to a public defender, "as most have never done a murder trial."

¶ 8      Also on March 17, 2023, defendant, his public defender, and the State appeared before the circuit court for an arraignment. The trial court asked defendant whether he wished to represent himself, and defendant answered affirmatively. Responding to the trial court's questions, defendant stated that he was 60 years old, had earned an associate's degree, and was previously "working on" a bachelor's degree. Defendant also confirmed that he could read, write, and understand the English language, that he was not under the influence of drugs, alcohol, or prescription medication, and that he was not suffering from any physical or mental disability that would prevent him from understanding the proceedings that day.

¶ 9    The trial court proceeded to advise defendant about the two counts of first degree murder that he faced, describing the allegations contained in those counts, and defendant indicated that he understood both counts. The trial court informed defendant that first degree murder was punishable, *inter alia*, by imprisonment for a term of 20 to 60 years or, because of defendant's prior conviction for aggravated criminal sexual assault, by imprisonment for an extended term of 60 to 100 years. Defendant indicated that he understood the possible penalties. The trial court asked defendant whether he ever had represented himself, and he answered in the negative. Defendant admitted that he was not an attorney.

¶ 10    At that point, the trial court discussed with defendant "the pitfalls" of self-representation. These pitfalls included "hav[ing] to adhere to the technical rules governing conduct of a trial" and "hav[ing] to comply with evidence rules," all despite not being an attorney. Defendant indicated his understanding. Defendant also understood that if he represented himself, he would be disadvantaged because he would not be represented by an attorney while the State would be. When the trial court asked defendant whether he understood that he could not "count on" the trial court to give him "special consideration" due to his being *pro se*, defendant indicated his understanding. He also understood that he would have limited legal resources as an inmate in the county jail, and that if he changed his mind about legal representation before his trial began, he should request the appointment of counsel as soon as possible in order to maximize the chance of having an attorney appointed. Finally, the trial court asked defendant whether he understood that he had a right to be represented by an attorney of his choosing, and that if he could not afford an attorney, one could be appointed to represent him. Defendant indicated his understanding.

¶ 11    The trial court found that defendant "possess[ed] the requisite mental capacity to make a knowing, intelligent waiver of [the] right to counsel" and opined that he had "the ability to

3

represent [himself]." The trial court also found that defendant made "a knowing and intelligent decision" to waive his right to counsel. Accordingly, the trial court discharged the public defender and allowed defendant to serve as his own attorney. From there, the trial court continued with arraignment. The trial court also entered a written order permitting defendant to proceed *pro se*.

¶ 12                                    C. Jury Trial

¶ 13    On May 30 through June 1, 2023, a jury trial was held. Defendant acted *pro se*. Sixteen witnesses testified for the State, and seven witnesses testified for defendant, including defendant himself. A thorough summary of the evidence adduced at trial is included in this court's decision in the direct appeal, discussed below. Essentially, defendant drove his pickup truck into Lisa Dunnavant-Polach as she was climbing into a semi-trailer truck, virtually ripping off the lower half of her left leg, causing her death. On June 1, 2023, the jury returned a verdict finding defendant guilty of first degree murder.

¶ 14                        D. Posttrial Motion and Sentencing

¶ 15    On June 13, 2023, the trial court set the cause for a hearing on all posttrial motions and sentencing. The hearing date was July 18, 2023.

¶ 16    On June 14, 2023, the Madison County probation office filed a presentence investigation report (PSI). The PSI showed that defendant's felony convictions included, *inter alia*, a 1995 conviction, with a 50-year prison sentence, for aggravated criminal sexual assault of a victim under 13 years of age, and a 1983 conviction, with a 6-year prison sentence, for rape. He also had numerous misdemeanor and traffic convictions. Defendant refused to cooperate with the PSI investigation.

¶ 17     On June 23, 2023, defendant filed a motion, stating that he wanted his sentencing "done and over with" so that he could be "shipped" to prison and would not have to remain "in the hole not able to do anything." Defendant did not file any other posttrial motions.

¶ 18     On July 18, 2023, the State and defendant appeared before the trial court for a scheduled hearing on the posttrial motion and a sentencing hearing. The trial court began the hearing by reading aloud the motion that defendant had filed on June 23, 2023, and stated that the trial court interpreted the motion as an expression of a desire for a sentencing hearing. The trial court also stated that earlier that day, Judge Napp spoke by telephone with jail personnel, who told Judge Napp that defendant thought he had asked for an attorney to represent him at sentencing. The trial court then asked defendant whether he wanted her to appoint counsel for him. Defendant replied: "Let's just get the sentence and get it over with. Let's get the hell out of here." The trial court explained that if defendant did not want a public defender, it would proceed immediately to sentencing, but if he said that he wanted a public defender, one would be appointed and the matter would be continued to allow the public defender an opportunity to read the record and the transcripts and file a posttrial motion. "That will take at least 90 days," the trial court told defendant, adding that it had dealt with a case where this process took "a lot longer than 90 days." Telling defendant that the choice was his to make, the trial court said that defendant would need to state what he wanted to do. After some back and forth, defendant answered, "No. I don't need a Public Defender. Let's get this over with." Repeatedly, the trial court asked defendant whether he wanted the appointment of counsel for the filing of posttrial motions or sentencing, and defendant answered in the negative. The trial court asked, "Do you wish to represent yourself and proceed today?" Defendant answered, "Yes, ma'am." One last time, the trial court asked defendant

whether he understood that it would appoint an attorney if he wanted one, and defendant again answered in the affirmative. The trial court immediately proceeded to a sentencing hearing.

¶ 19 No witness in aggravation or mitigation testified at the sentencing hearing. The State recommended an extended-term prison sentence of 95 years. See 730 ILCS 5/5-4.5-20(a)(2), 5-5-3.2(c)(1) (West 2022). Defendant declined to make a statement in allocution. The trial court found that defendant had a history of prior criminal activity and that the sentence was necessary to deter others. See *id*. §§ 5-5-3.2(a)(3), (7). Also, the trial court found that no mitigating factors applied. The trial court imposed a discretionary prison sentence of 60 years, to be served at 100%, followed by mandatory supervised release for 3 years. (A 60-year prison sentence was the maximum nonextended-term sentence for first degree murder. See *id*. § 5-4.5-20(a).

¶ 20 The trial court admonished defendant about his appeal rights, and defendant indicated his understanding. The circuit clerk filed a notice of appeal on defendant's behalf, thus perfecting his direct appeal. The trial court appointed OSAD as defendant's direct-appeal counsel.

¶ 21 E. Direct Appeal

¶ 22 On direct appeal, OSAD concluded that there was no reasonably meritorious argument for reversing defendant's conviction or sentence. Accordingly, OSAD filed a motion to withdraw as counsel and a supporting brief. See *Anders v. California*, 386 U.S. 738 (1967). OSAD raised 12 potential issues in its supporting brief. These issues included whether the State had proved guilt beyond a reasonable doubt, whether defendant had validly waived his right to counsel, and whether the trial court had abused its discretion in sentencing defendant to imprisonment for 60 years.

¶ 23 Agreeing with OSAD, this court explained how each of the 12 potential issues was without arguable merit. This court affirmed the judgment of conviction. *People v. Mayor*, No. 5-23-0524 (2024) (unpublished summary order under Illinois Supreme Court Rule 23(c)).

6

¶ 24          F. Postconviction Petition: The Subject of the Instant Appeal

¶ 25    On October 15, 2024, defendant filed a *pro se* verified petition for relief pursuant to the Act (725 ILCS 5/122-1 *et seq.* (West 2022)). Defendant did not divide his postconviction petition into separate claims. Instead, he adopted a narrative form, presenting most of his claims in a single lengthy paragraph under the heading "motion for newly discovered evidence." Defendant stated that after he was found guilty of first degree murder, he "was placed on suicide watch," and he "remained in the hole (segragation [*sic*] cell) until he was sent to the Illinois Department of Corrections on July 21st 2023." He further stated that despite his repeated requests to be taken off suicide watch and removed from segregation, he was told that he would remain in segregation until he was sent to prison. On July 18, 2023, defendant went to court for sentencing, and at that time, the trial court asked him whether he wanted a public defender to represent him. The trial court explained to him that if he wanted a public defender, his sentencing would be delayed at least 90 days. Defendant alleged that the trial court knew that he was 60 years old and had been placed in segregation and that he, by that point, already had "slept on the concrete floor" of segregation more than 50 nights. Defendant asserted that the trial court's inquiry about a public defender "put [the defendant] in a corner" because his choosing legal representation would entail additional months of sleeping on a concrete floor. Even though, according to defendant, the trial court knew that defendant was suicidal while proceeding *pro se*, the trial court "did not have [his] mental health status checked" before proceeding to trial. Defendant further alleged that the State "withheld" from defendant, in violation of *Brady v. Maryland*, 373 U.S. 83 (1963), information concerning sections 104-10 and 104-13 of the Code of Criminal Procedure of 1963 (Criminal Procedure Code) (725 ILCS 5/104-10, 104-13 (West 2022)). These two statutes state that a defendant is presumed to be fit to stand trial and to be sentenced unless he is unable to understand the nature and purpose of

7

the proceedings against him or to assist in his defense, and the circumstances under which the trial court shall order a psychological examination of a defendant. Defendant contended that the trial court and the trial prosecutor wanted to "hurry the trial along" by not giving defendant "a mental health test" and by not "giv[ing] him a chance to ask for one."

¶ 26 After the one lengthy paragraph, defendant alleged that he had been given "a defacto [*sic*] life sentence by this court in violation of his 8th and 14th U.S. Constitution rights." For this allegation, defendant simply cited to two decisions of the United States Supreme Court—*Gregg v. Georgia*, 428 U.S. 153 (1976), and *Furman v. Georgia*, 408 U.S. 238 (1972). (Both *Gregg* and *Furman* dealt with statutory schemes for imposition of the death penalty, and the sort of statutory guardrails necessary to ensure that the imposition of the death penalty did not violate the United States Constitution.)

¶ 27 Four exhibits were attached to the postconviction petition. The first of the four exhibits was a single page of an "official incident field report—narrative" from the Madison County Sheriff's Office, dated June 1, 2023. All the names mentioned in the field report, except for defendant's name, had been blacked out. In the field report, a "reporting deputy" stated that on May 24, 2023, he had received an email from a captain, informing him of "messages sent by [defendant] via the jail tablet." Apparently, those messages had been sent by defendant to his two children, for they ended with the words, "love you dad." In the messages, defendant stated that if he were to be found guilty, he would not be returning to prison; that he had "a life insurance policy in with the truck paperwork;" and that his children should permit the jail to "do what they want" with his body since he did not have a preference and did not want that burden "to be put on you guys." The field report also stated that the captain who sent the email ordered that defendant should "immediately go on suicide watch" if he were found guilty. Also, the field report stated that on June 1, 2023, defendant

8

was found guilty, and upon his return to the jail, the reporting deputy and other deputies escorted defendant to "the Male Safe and Sober room" and placed him on "15 minute suicide watch" until such time as he was "cleared" by a mental health professional.

¶ 28　The three other exhibits were jail records, dated June 1, 2023, through July 20, 2023. These records showed that on June 1, 2023, "[a]s a precaution," defendant was "placed on 15 minute watch" after he returned from his trial. The records showed that defendant frequently refused meals and his "diabetic snack," and sometimes refused showers. He was repeatedly issued new modesty suits, safety blankets, and mats. On June 20, 2023, defendant was "offered but refused a new sleeping bag." On June 29, 2023, his sleeping bag was "washed and returned to him."

¶ 29　On December 20, 2024, the trial court entered an order that summarily dismissed the postconviction petition. According to the trial court, defendant contended in his petition that "he should not have been allowed to represent himself at trial and at his sentencing hearing" because "he was suicidal and therefore unfit to represent himself." This postconviction claim, the trial court stated, had been raised and decided on direct appeal and was therefore *res judicata*. Furthermore, the record "plainly demonstrate[d]" that defendant "understood the right and risks of self-representation."

¶ 30　Defendant filed a timely *pro se* notice of appeal, thus perfecting the instant appeal. The circuit court appointed OSAD as his appellate counsel.

¶ 31　　　　　　　　　　　　　II. ANALYSIS

¶ 32　This appeal is from the trial court's summary dismissal of defendant's *pro se* postconviction petition. As previously noted, defendant's appellate counsel, OSAD, has filed a *Finley* motion to withdraw as counsel. In the memorandum of law accompanying the *Finley*

motion, OSAD discusses four potential issues in this appeal. Defendant has responded with an objection to the *Finley* motion and a request for the appointment of new appellate counsel.

¶ 33 The Act provides a means to collaterally attack a criminal conviction based on a substantial denial of a defendant's state or federal constitutional rights. *Id.* § 122-1(a)(1); *People v. Hodges*, 234 Ill. 2d 1, 9 (2009). A postconviction proceeding begins with a defendant's filing a petition, verified by affidavit, in the trial court in which the conviction took place. 725 ILCS 5/122-1(b) (West 2022). Once the postconviction petition is filed, the trial court has 90 days to examine and rule upon the petition. *Id.* § 122-2.1(a). The trial court must accept as true, and liberally construe, all the allegations in the postconviction petition except for those contradicted by the record. *People v. Edwards*, 197 Ill. 2d 239, 244 (2001). If the trial court determines that the petition is frivolous or patently without merit, the trial court must summarily dismiss the petition in a written order. 725 ILCS 5/122-2.1(a)(2) (West 2022); *People v. Pendleton*, 223 Ill. 2d 458, 472 (2006). A petition is frivolous or patently without merit if it "has no arguable basis either in law or in fact." *Hodges*, 234 Ill. 2d at 16. "A petition which lacks an arguable basis either in law or in fact is one which is based on an indisputably meritless legal theory or a fanciful factual allegation." *Id.* Also, the phrase "frivolous or patently without merit" encompasses *res judicata* and forfeiture. *People v. Blair*, 215 Ill. 2d 427, 445 (2005). The doctrine of *res judicata* bars consideration of issues that were previously raised and decided on direct appeal. *Id.* at 443. Forfeiture bars issues that could have been raised but were not. *Id.* at 443-44. In order to avoid summary dismissal, a petition need only allege sufficient facts to state the "gist" of a constitutional claim. *People v. Gaultney*, 174 Ill. 2d 410, 418 (1996). If the trial court does not summarily dismiss the petition, it must docket the petition for further consideration. 725 ILCS 5/122-2.1(b) (West 2022).

¶ 34    Appellate review of the trial court's summary dismissal of a postconviction petition is *de novo*. *Hodges*, 234 Ill. 2d at 16. This court reviews the trial court's judgment, not its reasoning. *People v. Anderson*, 401 Ill. App. 3d 134, 138 (2010). Thus, this court may affirm on any basis in the record. *Id.*

¶ 35    The first potential issue discussed by OSAD is whether "the State or the [trial court] should have ordered [defendant] to undergo a fitness examination." OSAD concludes that this issue lacks arguable merit.

¶ 36    Section 104-10 of the Criminal Procedure Code (725 ILCS 5/104-10 (West 2022)) states that every defendant is "presumed to be fit" for trial and sentencing. "A defendant is unfit if, because of his mental or physical condition, he is unable to understand the nature and purpose of the proceedings against him or to assist in his defense." *Id.* Section 104-11(a) of the Criminal Procedure Code (*id.* § 104-11(a)) states that the issue of a defendant's fitness "may be raised by the defense, the State or the Court at any appropriate time before a plea is entered or before, during, or after trial. When a *bona fide* doubt of the defendant's fitness is raised, the court shall order a determination of the issue before proceeding further." *Id*.

¶ 37    Here, the defense, the State, and the trial court did not raise the issue of defendant's fitness—whether before or during the trial or sentencing. Nor does the record suggest they should have. The record did not contain any indication that defendant was unfit, or that he might be unfit. Defendant did not, for example, disrupt the proceedings or respond incoherently to the trial court's questions. Indeed, approximately two and one-half months before trial, the trial court found that defendant "possess[ed] the requisite mental capacity" for a knowing and intelligent waiver of counsel, and that he had "the ability to represent [himself]." During trial, and right through

11

sentencing on July 18, 2023, defendant did not say or do anything that would cause anyone to reasonably doubt his fitness.

¶ 38 In his *pro se* postconviction petition, defendant alleged that the trial court had known that he was under suicide watch but nevertheless did nothing to determine his fitness. Even if defendant truly was suicidal, and even if the trial court was aware of it, a fitness hearing would not have been necessary. Defendant did not exhibit an inability to understand the nature and purpose of the proceedings against him or to assist in his defense. See 725 ILCS 5/104-10 (West 2022). Thoughts of suicide do not raise a *bona fide* doubt about fitness. Even a history of suicide attempts, by itself, does not raise a *bona fide* doubt about fitness. *People v. Woodard*, 367 Ill. App. 3d 304, 320 (2006) (citing *People v. Sanchez*, 169 Ill. 2d 472, 483 (1996)).

¶ 39 Based on our review of the record, we find no merit to the argument that the State should have raised the issue of defendant's fitness. Nor do we find merit to the argument that the trial court should have stopped the criminal proceeding for a determination of defendant's fitness.

¶ 40 The second of OSAD's potential issues is whether "the State erred in failing to disclose the existence and contents of 725 ILCS 5/104-10 and 725 ILCS 5/104-13(a)." OSAD concludes that this issue, too, lacks arguable merit.

¶ 41 In his *pro se* postconviction petition, defendant alleged that the State had "withheld" from defendant information concerning sections 104-10 and 104-13(a) of the Criminal Procedure Code (725 ILCS 5/104-10, 104-13(a) (West 2022)). According to defendant, this withholding of information amounted to a violation of the holding in *Brady v. Maryland*, 373 U.S. 83 (1963). Section 104-10 of the Criminal Procedure Code is cited above, in this court's discussion of the first potential issue. As for section 104-13(a), it requires that a court, when an issue of fitness arises, order an evaluation of a defendant by one or more licensed physicians, clinical

12

psychologists, or psychiatrists chosen by the trial court. 725 ILCS 5/104-13(a) (West 2022). In *Brady*, the United States Supreme Court held that when the prosecution withholds "evidence" from the accused that is both "favorable to [the] accused" and "material either to guilt or to punishment," the prosecution is guilty of violating an accused's constitutional right to the due process of law. *Brady*, 373 U.S. at 87. As OSAD states in its memorandum of law, filed in support of its *Finley* motion, the *Brady* holding "does not create any duty for the State to disclose the existence of relevant published statutes to a *pro se* defendant." The *Brady* holding relates to evidence, and not to statutes. As such, we find there is no arguable merit to the second potential issue.

¶ 42    OSAD's third potential issue is whether "the [trial court] erred and 'put [defendant] in a corner' when [it] gave him the choice to either continue representing himself throughout sentencing, or to wait for the appointment of an attorney." In his *pro se* postconviction petition, defendant stated that when he went to court for sentencing on July 18, 2023, the trial court asked him whether he wanted to be sentenced that day or whether he wanted an attorney to represent him posttrial, which would probably delay matters for more than 90 days. Defendant alleged that at that time, the trial court knew that defendant, age 60, had been sleeping on the concrete floor of the segregation cell for more than 50 nights. The trial court's inquiry about legal representation "put [defendant] in a corner" because his choosing posttrial legal representation would entail additional months of sleeping on a concrete floor.

¶ 43    We find that the allegation that the trial court somehow cornered or coerced defendant is flatly contradicted by the record, and it therefore cannot be accepted as true. See *Edwards*, 197 Ill. 2d at 244. As OSAD states in its memorandum of law, filed in support of its *Finley* motion, "the [trial court] did not force [defendant] to make any particular decision." Instead, the trial court matter-of-factly presented defendant with the two possibilities that existed—posttrial

13

representation or no posttrial representation—and emphasized that the choice between the two was solely his own. In our view, defendant's claim that he was cornered or coerced has no basis in law or fact. See *Hodges*, 234 Ill. 2d at 16. Therefore, the third potential issue has no arguable merit.

¶ 44　OSAD's fourth and final potential issue is whether "his sentence violates the 8th and 14th amendments of the United States constitution." In his *pro se* postconviction petition, defendant alleged that he had been given "a defacto [*sic*] life sentence by this court in violation of his 8th and 14th U.S. Constitution rights." In the direct appeal, this court determined that defendant's 60-year prison sentence did not represent an abuse of the trial court's discretion. In the instant appeal, OSAD states in its memorandum of law that it is well-settled that "only *juveniles* are entitled to specific safeguards against *de facto* life sentences under the 8th and 14th amendments. See, *e.g.*, *Miller v. Alabama*, 567 U.S. 460, 473-74 (2012)." In *Miller*, the court held that the eighth amendment to the United States Constitution "forbids a sentencing scheme that mandates life in prison without possibility of parole for juvenile offenders." *Miller*, 567 U.S. at 479. OSAD is correct that the *Miller* protections apply only to juvenile offenders, *i.e.*, those under the age of 18. See *People v. Harris*, 2018 IL 121932, ¶¶ 58-61. At the time defendant murdered Lisa Dunnavant-Polach, he was 60 years old, long past his juvenile years. Accordingly, *Miller* does not apply to his sentence, and his sentence does not violate the United States Constitution. We find that the fourth potential issue lacks arguable merit.

¶ 45　　　　　　　　　　　　III. CONCLUSION

¶ 46　The trial court did not err in summarily dismissing defendant's postconviction petition, and any argument to the contrary would lack merit. Accordingly, this court grants OSAD leave to withdraw as defendant's appellate counsel and affirms the judgment of the trial court.

14

¶ 47    Motion granted; judgment affirmed.