FIRST DIVISION
DECEMBER 10, 2007

No. 1-05-3086

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| | ) | |
| v. | ) | No. 04CR 9052 |
| | ) | |
| NATHANIEL DAVIS, | ) | Honorable |
| | ) | Evelyn B. Clay |
| Defendant-Appellant. | ) | Judge Presiding. |

JUSTICE ROBERT E. GORDON delivered the opinion of the court:

Defendant Nathaniel Davis was convicted after a bench trial of aggravated kidnaping and possession of a stolen motor vehicle and sentenced to concurrent terms of 18 years and 7 years of imprisonment. On appeal, defendant claims that his vacillating waiver of his right to testify required the trial court both to clarify his answer and to inquire into his competency to stand trial. The defendant also claims that the Sex Offender Registration Act (730 ILCS 150/1 et seq. (West 2004)) was unconstitutional as applied to him because there was no finding that his kidnaping offense was sexually motivated.

BACKGROUND

The indictment charged the defendant with four counts of aggravated kidnaping: (1) by secretly confining the victim for the purpose of obtaining ransom; (2) by using force or threat of force to carry the victim from one place to another for the purpose of obtaining ransom; (3) by secretly confining a person under the age of 13 years; and (4) by using force or threat of force on a person under the age of 13, with the intent to secretly confine. 720 ILCS 5/10-1, 5/10-2(a) (1), (2) (West 2004). Count V charged aggravated vehicular hijacking; and count VI charged possession of a stolen motor vehicle. 720 ILCS 5/18-4(a)(2) (West 2004); 625 ILCS 5/4-103(a) (West 2004). Defendant was ultimately found guilty of counts III and V, and acquitted of the other counts.

On May 3, 2004, the trial court granted the defendant's request for a fitness examination with respect to both his fitness to stand trial and his sanity at the time of the offense. On August 10, 2004, Dr. Jonathan Kelly, a forensic psychiatrist, reported that the defendant was presently fit to stand trial and was not taking any psychotropic medication. However, Dr. Kelly was unable to complete the sanity evaluation because he was waiting for additional records. On August 11, the parties appeared before the trial court and acknowledged receipt of Dr. Kelly's letter. Defense counsel did not raise any objections to Dr. Kelly's conclusion. On November 17, 2004, Dr. Kelly reported that the defendant was legally sane at the time of the alleged offense. On November 18, 2004, the parties appeared before the trial court and acknowledged receipt of Dr. Kelly's second letter. Again, defense counsel did not raise any objections to Dr. Kelly's second conclusion.

On January 20, 2005, the defendant waived his right to a jury trial both in open court and

in writing, and the case proceeded to trial. The State called six witnesses: Aki and Nina Williams, parents of the kidnaped child; Dewan Jackson and Jesse Hall, who accompanied the defendant and the kidnaped child in the stolen vehicle; and police officers Lopez and Keller, who investigated the kidnaping. The defense called one witness: Nancy Evans, defendant's mother.

Aki Williams testified as follows: He is the father of one-year-old Aki Jonathan Williams. On March 29, 2004, at 3:45 p.m., he stopped his four-door silver Ford Taurus in front of a house on West Walnut Street, and left his child in the backseat, with the motor running. The windows were down because it was approximately 80 degrees. Acting as the rent collector for his grandfather, he rang the door bell of a house on Walnut Street that had been converted into two apartments. The front door was approximately 25 feet away from the vehicle. After a woman came to the door, Aki and the woman were "discussing the matter" on the front porch and then she signed a rent receipt. As she was signing the receipt, Aki saw the defendant entering Aki's vehicle and driving away at a high rate of speed. Aki did not see anyone on the street in pursuit of the defendant. Approximately six or seven minutes elapsed between the time Aki exited his vehicle and the time the defendant drove it away.

Aki further testified that a neighbor lent him a telephone and he contacted: the Chicago police department; radio station WGCI, so that the station could place an alert; and his wife. Approximately 10 or 12 minutes after the abduction, Aki called his cellular telephone, which was still in the stolen vehicle. When Aki said hello, the person on the other end said "money, money, money" and hung up. Aki called back almost immediately, and again a person answered by saying "money, money, money." The third time that Aki called, the answering person again said

3

"money, money, money" but this time Aki managed to say "how much" before the person hung up. The fourth time that Aki called, the answering person again said "money, money, money" and Aki said, "How much? I will give you anything." This time, the person responded "ten thousand" before hanging up. After the call with the "ten thousand" demand, Aki tried calling "over and over again" but the calls were not answered. During these calls, Aki was still in front of the Walnut Street house, using the neighbor's telephone.

Aki further testified that Officers Lopez and Fouler arrived and attempted to call the kidnapper. Aki described the defendant to the officers as "dark skinned, bald guy with Dago T on." Approximately an hour later, Aki learned that his son was at the police station, and later he was reunited with his son at the station.

Next the prosecution called Nina Williams, the child's mother, who testified as follows. On March 29, 2004, she was at work, when she learned that Aki's vehicle had been stolen with their baby in it. Like her husband, Nina called his cellular telephone repeatedly. On one call, someone answered and she asked, "[W]here's my baby?" The person replied, "[B]oy with his father." Nina then told him, "No, he is not with his father *** he's been kidnaped *** he's been vehiclejacked." Then Nina begged him to drop the boy off at the police station or at a "McDonald's [or] anywhere."

Nina further testified that she kept calling and eventually someone answered again. When she asked where her baby was, the person again responded "with his father." Nina then asked where the father was, and the person replied, "[W]e dropped him off at his mother's house." Nina said, "[W]hat you mean you dropped him off at his mother's house?" and "[W]hose got the

4

baby?" The person replied, "[H]is father Nate." After stating that the father's name was not Nate, Nina asked the person to describe the "father." The person stated the "father" was "tall and dark skinned." Nina stated no, the "baby's father is light skinned, has freckles."

Nina testified that the person on the telephone with her was later identified to her as Tewan Jackson. Nina remained on the telephone with Tewan, as he and another man drove to the police station and Tewan tried to explain the situation to the officer at the front desk. Nina kept asking Tewan to hand the telephone over to the officer so that she could speak directly with the officer, but the officer refused to speak with her over the cellular telephone. So Tewan obtained the telephone number for the telephone at the officer's desk and provided it to Nina. Nina then hung up with Tewan and called the officer. She explained to the officer that Tewan knew the location of her kidnaped baby. Nina testified that she was later reunited with her baby at the police station.

The prosecution's third witness was Tewan Jackson. Tewan testified that he had known the defendant for approximately eight or nine years. On March 29, 2004, Tewan and Jesse Hall were standing near the corner of Sheridan and Windsor, when the defendant drove up in a four-door grey vehicle and said "hop in," which they did. Tewan sat in the front, and Jesse sat in the back, next to the baby. Tewan had not seen the defendant in almost a year, and the defendant said the baby was his.

Tewan testified that the defendant was not wearing shoes, that his nose and part of his lip were black, that he was dirty and that his arms had bruises. The defendant told Tewan that "he got beat up *** [o]n the south side" and that he was in a fight with "[h]is baby mama."

Tewan testified that the defendant had a cellular telephone that kept ringing. When the defendant answered it, he said "money, money" and hung up. Other times, he told Tewan or Jesse to say "money, money" into the telephone. Tewan thought it was a joke or a gag. Once, Tewan heard the defendant say "ten thousand" and "bitch have my money."

Tewan testified that the three of them were driving around for approximately 10 or 15 minutes during which time they picked up another friend of the defendant's and drove this friend home. Eventually, the defendant drove to his mother's home, exited the vehicle with the baby, and gave Tewan and Jesse the keys to the vehicle and the cellular telephone. When the cellular telephone rang, Tewan answered and heard a woman say that someone had kidnaped her baby. Then Tewan called her back and asked her what the problem was, and she asked him to drop off her baby at a "McDonald's or something."

Tewan testified that he then drove to the police station. When Tewan and Jesse arrived, the officer told them to go back outside and write down the license plate number of the vehicle. When they came back inside, the woman who had called previously called Aki's cellular telephone again and kept asking to speak directly to the officer, but the officer told Tewan and Jesse to tell her to call the telephone number at the police desk. After speaking with the woman, the police took Tewan and Jesse into custody, and they waited approximately a half an hour. Then Tewan and Jesse went with police officers back to the defendant's mother's house to retrieve the baby. Tewan and Jesse gave the police directions, and waited in the police vehicle while the police entered the home. The police exited with both the defendant and the baby.

The prosecution's fourth witness was Jesse Hall, who was currently in custody for

"violation of bootcamp," which he received for "[a] drug conspiracy." On March 29, 2004, he was in the vicinity of Sheridan Road and Windsor Avenue with Tewan Jackson, when the defendant drove up in a grey Ford Taurus. Jesse had not seen the defendant in more than two years. The defendant asked if they wanted to make some money, and they entered the vehicle.

Jesse testified that he noticed the baby in the backseat and the defendant's odd appearance, namely, that he was shoeless, wearing a bloody and ripped top, and "high off something" and his lips were black "like he had been smoking something." The defendant explained that he had a fight with "his baby mama" and "somebody jumped on him." The defendant also claimed that the baby was his. Jesse told the defendant that this baby could not be the defendant's because the baby was too pale.

Jesse testified that while they were driving around, they picked up another boy and gave him a ride home. A cellular telephone kept ringing, and the defendant answered it, saying "money, money." One time, the defendant placed the telephone near Jesse's mouth, and Jesse said "money, money." Jesse thought it was "a goof." When they reached the defendant's home, defendant exited the vehicle with the baby and told Tewan and Jesse that they could have the vehicle and the cellular telephone. Jesse thought it was strange that the defendant took the baby but left the babyseat in the vehicle.

Jesse testified that after Tewan spoke on the cellular telephone with the baby's mother, they drove to a police station. However, at the police station, every officer with whom they spoke thought that their story was a joke. Finally a sergeant held them in custody in order to investigate.

Jesse testified that police officers placed them in a police vehicle and Jesse gave directions to defendant's mother's house. The police officers retrieved the baby, and Jesse identified the defendant for the officers. After Jesse testified, the trial was continued until March 23, 2005, when Officers Lopez and Keller testified, as well as defendant's mother.

Officer Lopez testified that on March 29, 2004, he was dispatched to an address on Walnut Street in response to a claim of kidnaping. When the officer arrived at the address, Aki Williams, the child's father, stated that he had made contact with the kidnapper, and the officer spoke with the person on the telephone. The person kept muttering that he wanted "money, money, money" for the baby. Later, Officer Lopez had an opportunity to hear defendant speak when the defendant was in custody, and the officer testified that he identified defendant's voice as the same voice that he heard earlier on the telephone.

Officer Keller testified that on March 29, 2004, Jesse Hall and Tewan Jackson came to the police station. After speaking with Nina Williams, Officer Keller and his sergeant transported Jesse and Tewan in a police vehicle to the location directed by Jesse and Tewan. Jesse and Tewan waited in the police vehicle, while the officers entered the building and knocked on the door of a third-floor apartment The defendant's sister answered the door with the Williams' child in her arms. The sister stated that her brother had brought the child home, but she was confused because she knew the child was not his. Officer Lopez then placed defendant under arrest after finding him in the bedroom of the apartment. At the time of the arrest, the defendant was not dirty or disheveled. Officer Lopez exited the building with the defendant, and both Jesse and Tewan identified him.

The prosecution rested, and the defense called Nancy Evans, the defendant's mother. She is a "co-teacher" who works with learning-disabled children. The defendant had been living in Los Angeles and returned to Chicago on March 24, 2004, only five days before the incident with the Williams' baby. When the defendant returned home on March 29, Evans noticed that he was shoeless; that he had no belt and his pants were falling off; that he had "knots" on his head and the back of his head and his wrists were bleeding; that his shirt was ripped and bloody; that his socks had "sticker bugs all on them" and were filthy; and that he was crying but not blinking. However, she did not believe he was under the influence of drugs.

Evans testified that defendant handed her the baby, and she told him to lie down, which he did. Evans told her daughter to call 911, which she did. The police arrived, and she gave the baby to a police officer. Evans admitted that she signed a written statement that stated that she thought her son was high on something stronger than alcohol.

At the close of evidence, the parties stipulated that a report prepared by Detectives Schnoor and Hammond "includes the interview of the witnesses in this case and makes no mention of the dollar amount of ten thousand dollars" and that Tewan Jackson gave a handwritten statement which referred to the $10,000 amount.

After defense counsel stated that the defense rested, the trial court decided <u>sua</u> <u>sponte</u> to admonish the defendant of his right to testify:

"MR. MIRAGLIA (Defense Counsel): *** With that, judge, the defense rests.

THE COURT: State. I think I should admonish your client.

9

MR. MIRAGLIA: All right.

THE COURT: Mr. Davis, you have a right to testify at your own trial. Are you waiving that right, are you giving that up?

THE DEFENDANT: Nawl. I'm not giving that up. I'm waiving the right to testify.

THE COURT: All right. And that's your decision?

THE WITNESS: Yes, ma'am.

THE COURT: And only your decision?

THE DEFENDANT: Yes, ma'am.

THE COURT: Very well. Defense rests. State, is there rebuttal?"

At the conclusion of trial, the trial court found that there was no use of force, no threat of force and "no plan to kidnap a child for ransom." The trial court then found the defendant guilty on two counts, aggravated kidnaping of a child under the age of 13 and possession of a stolen motor vehicle, and acquitted the defendant on the other counts.

Defendant filed a motion for a new trial claiming that the evidence was insufficient to prove him guilty beyond a reasonable doubt and that he was denied both a fair trial and the equal protection of the law. On April 19, 2005, at the hearing on the motion, defense counsel stated that, "[e]ssentially, *** all we are arguing" is that "the defendant's state of mind" was "contrary to the court's finding that he knowingly and secretly confined that minor." The trial court denied the motion, finding that "the evidence was overwhelming."

10

On April 19, 2005, at the sentencing hearing, the defendant's mother testified that she did not believe defendant was on drugs at the time of the offense. The trial court sentenced defendant to 30 years for the charge of aggravated kidnaping, and 7 years for the charge of possession of a stolen motor vehicle, to run concurrently. On May 10, 2005, defendant moved the court to reconsider the sentence of aggravated kidnaping, claiming that it was excessive and that the trial court gave undue consideration to elements of the charged offenses of which he was acquitted. On July 29, 2005, at the hearing on the motion to reconsider the sentence, the trial court stated:

> "[T]he court confesses error at this time, that, in fact, that [it] was
>
> improper to consider the aggravation of a count that the defendant
>
> was not found guilty of. And I – that is exactly what happened. I
>
> did consider the fact of the ransom demand that came out in trial
>
> but was not supported by the evidence, and the defendant was not
>
> found guilty of that count."

The trial court then reduced defendant's sentence for the aggravated kidnaping charge from 30 to 18 years. The State then filed a motion to reconsider the reduction which the trial court denied. The defendant filed a timely appeal.

## ANALYSIS

On appeal, defendant claims that the trial court failed to clarify the defendant's vacillating waiver of his right to testify and failed to conduct an inquiry into defendant's competency as a result of his vacillating waiver. The defendant also challenges the application of the Sex Offender Registration Act (730 ILCS 150/1 et seq. (West 2004)) to this nonsexual offense. For the reasons

11

discussed below, this court affirms.

Waiver of Right to Testify

When the trial court asked the defendant whether he waived the right to testify in his own defense, the defendant vacillated, answering first no and then yes. On appeal, the defendant claims that the trial court erred by failing to probe the defendant's vacillation.

The State claims that the defendant waived this issue by failing to object either at trial or in a posttrial motion. The Illinois Supreme Court has held that a "defendant must both specifically object at trial and raise the specific issue again in a posttrial motion to preserve an alleged error for review." People v. Woods, 214 Ill. 2d 455, 470 (2005); People v. Piatkowski, 225 Ill. 2d 551, 564 (2007). In the case at bar, the defendant failed both to object at trial and to raise the issue in a posttrial motion.

In response, the defendant claims that the waiver rule is relaxed when the objection is to the trial court's own conduct. The Illinois Supreme Court has held that "[a]pplication of the waiver rule *** is less rigid where the basis for the objection is the circuit court's conduct." People v. Davis, 185 Ill. 2d 317, 343 (1998); People v. Williams, 173 Ill. 2d 48, 85 (1996).

The reason for relaxing the waiver rule is that the objection would have fallen on deaf ears. Thus, for example, the supreme court relaxed the waiver rule when the trial judge refused to consider mitigating evidence at the defendant's death penalty hearing (Davis, 185 Ill. 2d at 343) or refused to allow defense counsel to participate in formulating a response to a jury's note (Williams, 173 Ill. 2d at 85). This court also relaxed the waiver rule when the trial judge interrupted the defendant's testimony to offer unsolicited advice about his decision to testify.

12

No. 1-05-3086

People v. Vaughn, 354 Ill. App. 3d 917, 920-21 (2004).

In the case at bar, the basis for the defendant's objection is not the trial court's conduct but the defendant's vacillating answer. The defense raised no objection at trial or on this appeal to the trial court's decision to question the defendant. Before questioning the defendant, the trial court notified defense counsel of its intent to "admonish" his client, and defense counsel responded affirmatively.

Since an objection would not have been a criticism of the court's decision, there was no reason to think that a request to clarify the defendant's answer would have fallen on deaf ears. The trial judge's respect for counsel was shown by the fact that she notified counsel of her intent to question his client before doing so. After defendant's vacillating answer, defense counsel could have asked the trial court to pose additional questions or requested a break to consult with his client. This court has stated repeatedly that the burden of protecting the right to testify rests on defense counsel, not on the trial court (e.g., People v. Hernandez, 351 Ill. App. 3d 28, 37-39 (2004); Vaughn, 354 Ill. App. 3d at 925); and the defendant has not claimed that his counsel's performance was deficient in any way

Defendant's failure to object at trial robbed the trial court of the opportunity to correct the error and his failure to object in a posttrial motion deprived this court of the factual findings that the trial court might have made concerning the defendant's proposed testimony. Vaughn, 354 Ill. App. 3d at 925 (when an appellate court reviews a claim that the trial court's conduct dissuaded a defendant from testifying, "an offer of proof as to what the testimony would have been is relevant"). Since there is no reason to think that a request from counsel would have fallen on deaf

13

ears, the relaxed waiver rule does not apply in this case. As a result, this court will review for plain error only.

When a defendant has failed to preserve an error for review, an appellate court may still review for plain error. "[T]he plain-error doctrine allows a reviewing court to consider an unpreserved error when (1) a clear or obvious error occurs and the evidence is so closely balanced that the error alone threaten[s] to tip the scales of justice against the defendant, regardless of the seriousness of the error, or (2) a clear or obvious error occurs and that error is so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process, regardless of the closeness of the evidence." Piatkowski, 225 Ill. 2d at 565; Woods, 214 Ill. 2d at 471. On appeal, defendant claims only the second prong of the plain error test, namely, that the error was serious.

In the case at bar, defendant claims that the error was the trial court's failure to ask a follow-up question and that the error was serious because it concerned his right to testify. Vaughn, 354 Ill. App. 3d at 924-25 (guaranteed by the due process clause of the fourteenth amendment). Although the right to testify is a fundamental right ( People v. Whiting, 365 Ill. App. 3d 402, 407 (2006)), the Illinois Supreme Court has held that a trial court has no duty to inform a defendant about the right to testify or to obtain an "on-the-record waiver." People v. Smith, 176 Ill. 2d 217, 234-35 (1997). On appeal, the defendant bears the burden of demonstrating that any waiver by him was not "knowing." Smith, 176 Ill. 2d at 236 n1.

If a defendant is represented by counsel at trial and does not testify, a trial court may presume that he chose not to exercise this right, unless he notified the trial court of his desire to

testify. Smith, 176 Ill. 2d at 234-35. A trial judge who chooses to admonish a defendant about the right to testify must "walk the fine line" between discouraging either the right to testify or the right to remain silent. Vaughn, 354 Ill. App. 3d at 925.

A defendant has both a constitutional right to testify in his own defense, and a constitutional right to remain silent. Vaughn, 354 Ill. App. 3d at 924-25 (discussing the fourteenth amendment "due process" right to testify); People v. Hernandez, 351 Ill. App. 3d 28, 36-37 (2004) (discussing the fifth amendment right not to testify). In the case at bar, if the defendant intended to exercise his fifth amendment right to remain silent, then the trial court's failure to ask a follow-up question was not a serious error, because the defendant exercised, in effect, the right he wanted. Only if the defendant wanted to exercise his due process right to testify, could the trial court's error become serious.

However, defendant does not claim that he wanted to testify. It is important to establish what defendant is not claiming. He is not claiming: that he wanted to testify; that the trial court frustrated his intent by failing to ask a follow-up question; and that if the appellate court remanded this case for a new trial, he would exercise his constitutional right to testify at the new trial.[1]

Instead on appeal, defendant claims that we, the courts, have no idea what he wanted to do, and he is not going to tell us – at least not yet. He claims that the appellate court should

---

[1]In his reply brief, defendant stated: "Mr. Davis is not arguing that the trial court's admonishments influenced him not to testify when he wanted [to]."

remand this case to the trial court, where the trial court can again ask the defendant what he wants to do. However, after a remand based on an alleged violation of his right to testify, the defendant could state that he had wanted to exercise his right to remain silent all along. Defendant's arguments make no sense.

Defendant claims that his vacillating answer showed that, he did not understand either the concept of waiver or the right to testify. As noted above, "Illinois courts have long held that when a defendant is represented by counsel, the trial court does not have a duty to tell a defendant of his right to testify." Vaughn, 354 Ill. App. 3d at 925, citing People v. Smith, 176 Ill. 2d 217, 234 (1997). While the ultimate decision of whether to testify belongs to the defendant, "it is the defense counsel's responsibility to advise a defendant about his right to testify and to explain any advantages or disadvantages of that right." Vaughn, 354 Ill. App. 3d at 925. In the case at bar, if defendant did not understand his rights to testify and to remain silent, the fault lay with counsel, not the trial judge, who was attempting to be helpful.

Defendant cited People v. Whiting, 365 Ill. App. 3d 402, 410 (2006), for the proposition that once a trial court decides to ask a defendant if he waives his right to testify, the trial court then has a duty to make sure the defendant's waiver is "knowing." Whiting is miscited. The Whiting case concerned a claim of ineffective assistance of counsel, not a claim of misconduct by the trial court. The defendant in Whiting claimed that her trial counsel told her, incorrectly, that she could not testify. The trial court in Whiting did not ask the defendant whether she wanted to waive her right to testify, so the appellate court did not have the opportunity to rule on a trial court's duty after posing a question. Contrary to the claim of the defendant in the case at bar, the

Illinois Supreme Court has held that a trial court has no duty "to inquire whether [the defendant] knowingly and intelligently waived" the right to testify. Smith, 176 Ill. 2d at 235.

Defendant claims that the trial court erred by failing to ask follow-up questions. There were at least three attorneys in the trial courtroom: the trial judge, the defense attorney, and the prosecutor. And no one voiced a need to clarify the defendant's answer.[2] While the trial judge, the defense counsel and the prosecutor were all able to hear defendant's tone of voice and pauses, and observe his body language as he delivered his answer, that information is obviously missing from the dry transcript before this reviewing court. The trial judge was in a far superior position than this court to understand defendant's response. In re Marriage of Bates, 212 Ill. 2d 489, 515 (2004) (trial court is in "the best position" to evaluate witnesses).

The case at bar is readily distinguishable from Ward v. Sternes, 334 F.3d 696 7th Cir. (2003), in which the Seventh Circuit Court of Appeal held that a trial court committed reversible error by failing to probe defendant's answer of, "I guess. I don't know," in response to the trial court's question of whether the defendant waived his right to testify. In Ward, "[T]he uncontroverted trial testimony" established that the defendant had "brain injuries [that] severely disrupted his ability to think, reason, take in verbal information, and understand and use language

---

[2]This court cannot help but notice that the trial transcript contains transcription errors. For example, on cross-examination, defense counsel asked prosecution witness Tewan Jackson whether he had a "phone conviction" and he answered yes, for drugs. Apparently, "phone" was mistyped for "felony."

17

to express his understanding." Ward, 334 F.2d at 705-06. _

    Ward is distinguishable because, first, it was an unusual case where the defendant suffered from "a severe language-processing deficiency." Ward, 334 F.3d at 706. The Seventh Circuit held that, absent evidence of this "severe language-processing deficiency, we would accept a trial court's interpretation given that court's superior position to observe the speaker and infuse meaning into the statement." Ward, 334 F.3d at 706. There is no claim that the defendant in the case at bar suffered from such an injury. The psychiatric examination concluded that the defendant was both sane at the time of the offense and fit to stand trial, and did not mention any injuries or impairments.

    Second, the defendant in Ward asked his counsel, immediately after the trial ended, why he was not allowed to testify and counsel promptly filed a posttrial motion on his behalf. Ward, 334 F.3d at 700, 707. The Seventh Circuit noted "the prudence of a rule that prevents criminal defendants from making unsubstantiated, self-serving and implausible post hoc arguments." Ward, 334 F.3d at 707. In contrast to Ward, the posttrial motion in the case at bar failed to raise this claim. For these reasons, Ward is readily distinguishable from the case at bar.

    In the case at bar, the trial court's conduct did not constitute error. However, even if we were to assume for argument's sake that the trial court's failure to ask a follow-up question was improper and caused the defendant to forfeit his right to testify, "a defendant is not deprived of his due process right to a fair trial unless it affects the outcome of the trial." Vaughn, 354 Ill. App. 3d at 925, citing People v. King, 154 Ill. 2d 217, 225 (1993). A reviewing court has a duty "to consider the entire record *** and to ignore errors, including most constitutional violations, that

18

were harmless beyond a reasonable doubt." Whiting, 365 Ill. App. 3d at 406.

A review of the entire record shows that the trial court's conduct was harmless. In the case at bar, the defense had already rested, when the trial court asked the defendant whether he waived his right to testify. The defense had already made the choice not to call the defendant as a witness. At least until the moment before the trial court posed its question, "defendant's decision not to testify must be viewed as [trial] strategy with which he agreed." Smith, 176 Ill. 2d at 235-36.

When a reviewing court determinines whether a trial court's discouragement of the right to testify affected the outcome of the trial, "an offer of proof as to what the testimony would have been is relevant" Vaughn, 354 Ill. App. 3d at 925; Smith, 176 Ill. 2d at 235 (finding no violation of the right to testify where defendant failed to "indicate of what his testimony would have consisted"). The defendant in this case had never made such an offer of proof, and this court cannot guess what his testimony would be. Three eyewitnesses identified defendant as the person who abducted the child: the father, who saw the defendant drive away with his vehicle and baby; and the defendant's two friends, who accompanied defendant while he drove around with the baby. The trial court acquitted defendant of the charges involving a ransom or use of force, so his intent to ransom or to use force is not at issue. Without an offer of proof and with three eyewitnesses to the crimes, this court finds that the trial court's conduct was harmless.

## Competency Hearing

Defendant claims that the trial court erred by not ordering a competency hearing after defendant's vacillating waiver. Like the prior claim, this claim has also been waived. The

defendant failed to raise this issue both at trial and in a posttrial motion. Piatkowski, 225 Ill. 2d at 564; Woods, 214 Ill. 2d at 470.

Defendant claims that a relaxed waiver rule applies because the trial court's conduct is at issue. Davis, 185 Ill. 2d at 343; Williams, 173 Ill. 2d at 85. As explained above, the relaxed rule applies when it is clear that the defendant's objections would fall on deaf ears. Davis, 185 Ill. 2d at 343; Williams, 173 Ill. 2d at 85; Vaughn, 354 Ill. App. 3d at 920-21. However, nothing in the record suggests that the trial court would have ignored a plea by defense counsel for a competency hearing. The record suggests just the opposite: when defense counsel requested a psychiatric examination of his client, the trial court agreed and ordered it. Defendant's failure to ask for a competency hearing robbed the trial court of the opportunity to cure the claimed error. Thus, the relaxed waiver rule does not apply.

This court will review only for plain error. As stated above, the plain error doctrine permits a court to consider an unpreserved error that either (1) threatened to "tip the scales" against the defendant in a closely balanced case or (2) was "so serious that it affected the fairness of the defendant's trial." Piatkowski, 225 Ill. 2d at 565; Woods, 214 Ill. 2d at 471. In his brief to this court, defendant claims only the second prong of the plain error test.

If a defendant is not fit to stand trial, his or her prosecution violates due process. People v. Woodard, 367 Ill. App. 3d 304, 319 (2006). A defendant is fit to stand trial if he or she can (1) understand the nature and purpose of the proceedings and (2) assist his or her counsel in presenting a defense. Woodard, 367 Ill. App. 3d at 319. At a fitness hearing, "the defendant bears the burden of proving facts which give rise to a real, substantial, and legitimate doubt" about his

20

or her fitness. Woodard, 367 Ill. App. 3d at 319. Since "fitness" refers only to an ability to function at trial, and not to competence in other areas, "a mental disturbance or an instance of psychiatric treatment does not necessarily raise a bona fide doubt of fitness." Woodard, 367 Ill. App. 3d at 319.

A trial court must order a fitness hearing sua sponte if facts are brought to the trial court's attention that raise a bona fide doubt about the defendant's fitness to stand trial. Woodard, 367 Ill. App. 3d at 319. The issue of a bona fide doubt is left to the discretion of the trial court. Woodard, 367 Ill. App. 3d at 319. A reviewing court must keep in mind that the trial court had "the best opportunity to observe defendant's behavior and assess its level of propriety." Woodard, 367 Ill. App. 3d at 320. In determining whether a bona fide doubt existed, courts consider: "(1) the rationality of the defendant's behavior and demeanor at trial; (2) counsel's statements concerning the defendant's competence; and (3) any prior medical opinions on the issue of defendant's fitness." Woodard, 367 Ill. App. 3d at 319.

In the case at bar, the above three factors do not raise a bona fide doubt. First, defendant points to no instances of irrationality by defendant at trial, except for the vacillitating waiver. One vacillitating remark at trial is not enough to require a competency hearing. Second, other than the request for a psychiatric examination that was honored, defense counsel made no statements questioning defendant's competence. Third, the only medical opinion on the issue of defendant's fitness indicated that he was fit. Thus, all three factors point to defendant's competence to stand trial.

Defendant claims that his bizarre behavior at the time of the offense required a fitness

hearing. It was this behavior that prompted defense counsel to request, and the trial court to order, a psychiatric examination. Defendant claims that, after the examination declared him fit, the trial court should have still required a hearing, even though his own counsel did not deem one necessary.

The bizarre behavior cited by defendant was defendant's dirty, bloody, bruised and shoeless appearance, which led to his prescription and receipt of psychotropic medication. First, other than one vacillating remark at trial, defendant cites no evidence that the condition that existed at the time of the offense continued up to the time of trial. Second, he offers no evidence that this unnamed medical or mental condition, even if in existence at the time of trial, would have precluded his fitness to stand trial. The evidence before the trial court, namely, the result of the psychiatric examination, supported the opposite conclusion. Third, this court has held that "a circuit court is under no duty to sua sponte conduct a fitness hearing solely on the basis of the defendant having received such [psycho tropic] medications." Woodard, 367 Ill. App. 3d at 320. Thus, the absence of a competency hearing was not reversible error.

Sex Offender Registration Act

When the defendant was convicted, the Sex Offender Registration Act (730 ILCS 150/1 et seq. (West 2004)) required the registration of individuals convicted of aggravated kidnaping "when the victim was a person under 18 years of age, the defendant is not a parent of the victim, *** and the offense was committed on or after January 1, 1996" (730 ILCS 150/2(B)(1.5) (West 2004)). Defendant is required to register because he was convicted of aggravated kidnaping, his victim was under 18 years of age, he was not a parent of the victim, and the offense was

22

committed after January 1, 1996.

When defendant filed his appellate brief, he claimed that the application to him of the Sex Offender Registration Act (730 ILCS 150/1 et seq. (West 2004)) violated his rights to due process and equal protection under the United States Constitution, because there was no finding that his kidnaping offense was sexually motivated. However, shortly after the defendant filed his brief, the Illinois Supreme Court held that the registration of a defendant convicted of aggravated kidnaping did not violate due process, even where there was no finding of a sexual motivation. People v. Johnson, 225 Ill. 2d 573 (2007). Thus, after Johnson, defendant's due process claim clearly has no merit.

In his subsequent reply brief to this court, the defendant appeared to withdraw both his due process and equal protection claims. The reply brief stated: "Mr. Davis disagrees with Johnson, and for the purpose of potential federal review, maintains that the Sex Offender Registration Act violates due process and equal protection as applied to him." While seeking to preserve his claims for some future "federal review," the defendant appears to have abandoned both claims for this state appeal, recognizing as he must that this court does not disagree, as he does, with our supreme court.

In his reply brief, defendant did not attempt to distinguish Johnson on the ground that he claimed both equal protection and due process violations and Johnson was decided on due process grounds alone. The defendant did not raise this argument, and it would fail if he had.

First, the same test, namely, the rational basis test, applies to both claims and thus would result in the same outcome. In re Philip C., 364 Ill. App. 3d 822, 827 (2006) (the standards used

to determine the constitutionality of the Sexual Offender Registration Act under both the equal protection and due process clauses are identical); People v. Beard, 366 Ill. App. 3d 197, 201, 206 (2006) (the rational basis test was used to determine the validity of the Sexual Offender Registration Act under both the equal protection and due process clauses).

Second, the appellate court has already considered and rejected this exact same equal protection claim. In People v. Beard, 366 Ill. App. 3d 197, 206 (2006), a defendant kidnapper claimed that the Sex Offender Registration Act violated the equal protection clause as applied to him because his offense was not sexually motivated. The appellate court rejected this claim in an opinion that was discussed with approval by our Supreme Court in Johnson, 225 Ill. 2d at 588. See also People v. Woodward, 367 Ill. App. 3d 304 (2006) (this court rejected claim of defendant murderer that Sex Offender Registration Act violated equal protection as applied to her because her offense was not sexually motivated), cited with approval in Johnson, 225 Ill. 2d at 588. Thus, contrary to defendant's claim in his first appellate brief, the application of the Sexual Offender Registration Act did not violate his right to equal protection.

Effective June 27, 2006, the Illinois state legislature amended the Sex Offender Registration Act to redefine the term "sex offense." Pub. Act 94-945, eff. June 27, 2006 (amending 730 ILCS 150/2(B)(1.5). Section 2(B)(1.5) of the Act still includes in its definition of "sex offense" aggravated kidnaping of a person under 18 years of age, when the perpetrator is not a parent. (730 ILCS 150/2(B)(1.5) (West 2006). However, the legislature amended the Act to require registration only when "the offense was sexually motivated," 730 ILCS 150/2(B)(1.5) (West 2006).

The same bill that amended the Sex Offender Registration Act also contained the Child Murderer and Violent Offender Against Youth Registration Act (Pub. Act 94-945, eff. June 27, 2006) (adding 730 ILCS 154/1 et seq.).  Now, a person convicted of aggravated kidnaping of a minor, who is not his or her child, must register under the Violent Offender Against Youth Registration Act when the offense is not sexually motivated.

In his reply brief, defendant did not claim that his registration must be switched from the sex offender registry to the new registry for offenses against children.  Thus, this court has no reason to discuss the amendment.

CONCLUSION

For the foregoing reasons, the judgment of the trial court is affirmed.

Affirmed.

WOLFSON, and GARCIA, JJ., concur.