2020 IL App (1st) 162562-U

FIRST DIVISION
September 8, 2020

No. 1-16-2562

**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County |
| | ) | |
| v. | ) | No. 13 CR 842402 |
| | ) | |
| | ) | |
| JANET STRICKLAND, | ) | Honorable |
| | ) | James B. Linn, |
| Defendant-Appellant. | ) | Judge Presiding. |

_____

JUSTICE PIERCE delivered the judgment of the court.
Presiding Justice Griffin and Justice Walker concurred in the judgment.

**ORDER**

¶ 1     *Held*:   The State proved defendant guilty of solicitation of murder.  Defendant did not receive ineffective assistance of counsel.

¶ 2     Defendant, Janet Strickland[1], along with her co-defendant grandson, William "Dashawn" Strickland, were charged with multiple counts of first-degree murder and solicitation of murder, for their roles in the death of defendant's husband, William Strickland.  Following a bench trial, defendant was convicted of solicitation of murder and was sentenced to 18 years' imprisonment.

_____

[1]     Defendant is the sole party to this appeal.  We affirmed co-defendant William "Dashawn" Strickland's conviction and sentence in *People v. Strickland*, 2019 IL App (1st) 161098.

On appeal, defendant argues that the evidence was insufficient to convict her of solicitation of murder beyond a reasonable doubt and her trial counsel was ineffective.    For the following reasons, we affirm.

¶ 3                                    BACKGROUND

¶ 4      Prior to trial, the State filed a motion in *limine* to introduce co-conspirator statements alleging that Janet and Dashawn conspired to kill William.  The State's motion sought to introduce 11 out-of-court co-conspirator statements from Dashawn[2] against defendant:

1.   "Deshawn indicated that [defendant] was sick of his grandfather and that she wanted someone to kill him. He indicated that his grandmother would pay somebody two stacks. He asked Armstrong if he would do it."

2.   "Deshawn asked Armstrong if he was still going to do it. Dashawn told Armstrong that he was supposed to grab a bag from his grandfather that would contain a stack in it. He told Armstrong that he would have to wait, and his grandmother would pay him the other stack."

3.   "When Armstrong told Deshawn he did not want to do it, Deshawn told him he was good. He told Armstrong that his grandfather came out for dialysis at 3:00 a.m., and that they would not pick up his grandfather in front of the house but down the street somewhere. He told Armstrong all he had to do was kill him, run and hop the gate. He told Armstrong that he (Dashawn) would park down the alley and take Armstrong · back to wherever he was at."

4.   "Deshawn said they were going to do it tonight [two days before the shooting]."

5.   "After Armstrong did not answer the phone the night before, Deshawn asked

---

[2] The State's motion referred to Dashawn as Deshawn.

Armstrong what happened. When Armstrong told Deshawn that he fell asleep, Deshawn told him it was tonight, don't be bullshitting."

6.   "While in the basement, Lavetta Sith heard [defendant] say to Deshawn that she was going to poison William, then laughed."

7.   "While in the basement, Lavetta Smith heard Deshawn say back to [defendant] that he was going upstairs and kill him."

8.   "Lavetta Smith heard Deshawn say to [defendant] that he got his friend "Black" to do it. He told her that "Black" was going to have to use the victim's gun because "Black" might not have another gun. Deshawn also said that he believed that "Black" was just playing around when he said he would do it, so Deshawn should just do it."

9.   During the conversation involving statement #8 above, [defendant] asked Deshawn if he found somebody yet. When Deshawn stated that he could use the victim's gun and do it himself, [defendant] said it was ok to use the gun, but that Deshawn shouldn't do it himself. [Defendant] stated that she needed it done bad, tomorrow."

10. "Deshawn used the phone in front of Lavetta Smith to call [defendant]. He told her he was checking in, then asked twice if he was dead."

11. "Deshawn Strickland told Lesley Strickland, during a visit at the jail, call Lavetta Smith or give him Smith's number to tell her not to testify."

¶ 5    Defense counsel conceded that statements one through ten in the State's motion met the criteria for admission against defendant under the co-conspirator exception to the hearsay rule but objected "for the record." The parties agreed that statement 11 was not admissible against Janet.

¶ 6    Defendant proceeded with a bench trial, which was held simultaneously with Dashawn's jury trial. At trial, Edward Cleveland testified that he was a retired medical transportation driver.

3

Cleveland had been driving 72-year-old William Strickland[3], the victim, to and from dialysis every Saturday for a year. Cleveland arrived at Strickland's home at 454 East 95th Street in Chicago at 3:28 a.m. on March 2, 2013 and parked the car. Cleveland heard several gunshots and saw Strickland collapsed in the gangway. He saw a young man about five feet nine inches tall, wearing a hoodie and baggy jeans, run out of the gangway and head west. He saw another young man who was about six feet tall, 160 pounds, wearing a hoodie, trying to take Strickland's bag away from him. This man ran north toward the alley. Cleveland got back into his car and drove around to see if he could locate the offenders, but he did not. He then got out of his car and went to check on Strickland and determined that he had been killed. He saw Janet Strickland, William's wife, standing by the side door of the house and told her to call 911. Cleveland spoke to the police when they arrived. Dashawn arrived at the house sometime later.

¶ 7    Chicago police officer Daniel Fava testified that he was on duty with his partner on March 2, 2013 and responded to a call of a person shot in the area of 454 East 95th Street. When he arrived, he saw Cleveland waving his arms at them. He also observed William lying in the gangway outside the door to the residence. William had sustained multiple gunshot wounds. There were shell casings and bullets on the ground near his body. Defendant was standing in the doorway to the gangway on the side of the house, crying.

¶ 8    Officer Fava spoke with Cleveland about the two possible offenders that fled the scene. Officer Fava searched the area but did not find anyone. Dashawn arrived a short time later. Officer Fava stated that Dashawn was "stone faced" and "apathetic."

¶ 9    A forensic pathologist determined that the victim died as a result of multiple gunshot

---

[3]    Defendant and the victim share the same first and last name. For clarification purposes, we will refer to defendant as "defendant" or "Janet" and the victim as "victim" or "William."

wounds to his body, including six gunshot wounds to his back.

¶ 10   Lesley Strickland testified that Dashawn is her son, William is her father and Janet is her stepmother.  She testified that she received a call from defendant sometime after 3 a.m. on March 2, 2013, informing her that William was dead.  Lesley drove from Milwaukee to Chicago and when she arrived at her father's house, she noticed that defendant appeared intoxicated and was not crying.

¶ 11   Lesley testified that defendant was spending money unusually, buying food and liquor for visitors, telling visitors to take furniture and talking about how she wanted to redecorate the house.  The following day, a 60-inch flat screen television and a television stand with a built-in fireplace and refrigerator were delivered to the house.  Lesley testified that defendant was on a fixed income and often asked to borrow money.  On March 30, 2013, Janet went to a casino in Milwaukee.

¶ 12   Lesley learned that Dashawn had been arrested and visited defendant in jail on April 4, 2013.  Dashawn told Lesley that defendant bought him a car after William's death because he "was involved in William's shooting."

¶ 13   While Lesley was visiting Dashawn in jail, Dashawn asked her to contact his girlfriend Lavetta Smith, because he did not want her to testify.  Lesley told Dashawn that his fingerprints were found on the gun.  She did not know if this was true but was fishing for information from him.  Dashawn called Lesley several days later and told her that defendant had paid him to take the gun out of the house.  Dashawn also stated that his fingerprints were not on the gun and that he did not shoot the victim.  The court reiterated that this conversation was only admitted against Deshawn.

¶ 14   On cross-examination, Lesley testified that she asked Deshawn about defendant because

she suspected defendant was involved. Lesley testified that defendant was with Williams for over 30 years and although they had a few periods of separation, they never divorced. At the time of William's death, defendant was not working but was being supported by William and his pension, as well as her disability income.

¶ 15    Lavetta Smith, Dashawn's girlfriend at the time of the murder, testified that in March 2012, she was living with Dashawn, the victim and defendant in the victim's home. Sometime before March 2, 2013, she overheard a conversation with Dashawn and defendant, where defendant said that she was going to poison the victim and Dashawn said he'd go upstairs and kill him. Defendant and Dashawn began laughing. In February 2013, she heard another conversation between defendant and Dashawn about killing the victim. Dashawn said that he needed a gun before the next day and would get it from defendant. The gun he was referring to belonged to the victim.

¶ 16    On February 28, 2013, Smith heard Dashawn tell defendant that "Black was playing," meaning that Armstrong did not want to kill the victim. Dashawn then said he was "was gonna kill his grandfather himself." Defendant and Smith told him not to. Dashawn said he was "gonna do it anyway."

¶ 17    Smith had previously seen Dashawn with the victim's gun. He had been carrying it for a month prior to the murder. Dashawn put the gun in a compartment under the passenger seat of the victim's car, which Dashawn would often drive. Smith identified the gun in open court.

¶ 18    On March 1, 2013, Dashawn drove Smith and Phillamena Stitts to a party, dropped them off and left. Dashawn did not have his own phone and borrowed defendant's when he went out. Dashawn used defendant's phone to communicate with Smith while she was at the party. Dashawn picked up Smith, Stitts and another friend from the party. He dropped Stitts off at home

6

and then went to another party. They left the party after about 15 minutes, dropped the friend off and went back to Stitts' house. Smith fell asleep on the couch.

¶ 19    Dashawn woke Smith up and said they were "fittin' to go, he was going to do this," which Smith understood to mean that he was going to "kill his grandpa." Dashawn and Smith left Stitts house and drove to the victim's home. They parked the car on the next block in the alley. Dashawn was armed with the same gun Smith had previously identified in open court. Dashawn told Smith to keep the doors unlocked and he ran toward the alley. Smith locked the doors and fell asleep. She awoke to Dashawn knocking on the window. Dashawn had a brown bag that looked full. He put the bag in the back seat and they drove back to Stitts' house.

¶ 20    When they arrived, Dashawn said he had to check in with defendant and used Stitts' phone to call her. Smith heard Deshawn say, "Is he dead?" Smith and Deshawn left Stitts' house and went back to the victim's house. Smith heard Deshawn ask Stitts "to put up" the gun for him.

¶ 21    After March 2, 2013, Deshawn began spending a lot of money. He bought Smith a tattoo, shoes, and earrings and bought himself a phone, shoes, and tattoos. Deshawn also bought a used Pontiac Grand Prix. Neither Smith, Deshawn nor defendant had a job.

¶ 22    On March 15, 2013, Dashawn and Smith went to Stitts' house for a party. When they arrived, Stitts brought out a black purse and handed it to Dashawn. Smith and Dashawn then went to Armstrong's house and Armstrong got into the car. Dashawn took some bullets out of the purse and handed them to Armstrong. Dashawn also gave Armstrong something else from the purse, but Smith could not see what it was.

¶ 23    Smith was arrested for this offense and originally lied to the police because Dashawn and his family had threatened her family. After she told police what really happened, she was released from custody. She admitted that she had a contempt charge against her for failing to appear at

trial. She did not want to testify but she was telling the truth.

¶ 24    Phillamena Stitts testified consistently with Smith about being picked up by Dashawn and Smith on the night of March 1, 2013 and going to several parties. Sometime after midnight on March 1, 2013, Dashawn dropped her off at her home and she went to sleep. She awoke later to Dashawn knocking on her window. She opened the door and let Dashawn and Smith in. Dashawn asked to use the phone. While he was on the phone, she heard Dashawn say, "Why can't I come home?" After he hung up, he said, "My granddaddy got shot." Smith and Dashawn then left.

¶ 25    Later that morning Dashawn and Smith came back to Stitts' house. Dashawn asked her to hold his gun and she agreed. Dashawn took the gun, which was wrapped in a t-shirt, out of his hoodie pocket and gave it to her. Stitts put the gun in a purse and put the purse in the basement closet. She identified the gun that Dashawn gave her in open court. Several days later, Dashawn sent her a message saying, "[i]f the detective asks you anything you don't know nothing."

¶ 26    On March 15, 2013, Smith and Dashawn went to Stitts' house. Dashawn asked Stitts to get what she was holding for him. She went inside, got the purse and gave it to Dashawn. Dashawn put the purse in a compartment under the back seat.

¶ 27    Stitts had a contempt charge pending against her for failing to appear in court. Those charges were withdrawn after her testimony.

¶ 28    Danny "Black" Armstrong testified that he knew Dashawn for about a year. During his trial testimony, Armstrong often stated that he did not remember facts and gave testimony contrary to his grand jury testimony. The State introduced portions of his grand jury testimony as substantive evidence.

¶ 29    In December 2012, Dashawn told Armstrong that defendant was tired of his grandfather

and wanted someone to kill him. Dashawn said that defendant would pay someone $2,000 to do it. Armstrong agreed to assist with the murder but did not think that Dashawn was being serious.

¶ 30    Armstrong testified in the grand jury that in February 2013, he had another conversation with Dashawn about killing his grandfather. Dashawn asked Armstrong if he was going to do it and he responded, "Yes." Dashawn told Armstrong to take his grandfather's bag after Armstrong killed him because it would have $1,000 in it. Defendant would give him the rest of the money.

¶ 31    Later that month Dashawn described the victim's routine to Armstrong. Dashawn told him that his grandfather left the house about 3 or 3:30 a.m. to go to dialysis and that someone would be coming to pick him up. Dashawn told Armstrong to just kill him, run out of the gate and meet Dashawn in the alley. Armstrong told the grand jury that, on the evening of February 28, 2013, Dashawn told him to commit the murder on March 1 at 3 a.m. Armstrong said he received additional calls from Dashawn that night but did not answer.

¶ 32    On March 1, 2013, Dashawn told Armstrong, "tonight, no bullshit." Armstrong stated that he was expecting a call later that evening from Dashawn but did not get one and explained that he thought his phone was dead. On the morning of March 2, 2013, Armstrong saw that Dashawn has posted on Facebook that, "I can't believe my grandfather [sic] gone." Armstrong told the grand jury that he called Dashawn and asked him what happened, and Dashawn told him that he did it himself.

¶ 33    Armstrong told the grand jury that about a week later he asked Dashawn if he could have the gun because he needed protection from gang members. Dashawn later gave him the gun that belonged to the victim. Armstrong identified the gun that Dashawn gave him in open court. When Armstrong was arrested, he gave detectives information about where they could find the gun. He called his friend K.O. and had him hide the gun in a pile of bricks so that the police

9

could recover it. He testified that when he called K.O. he did not know if K.O. had the gun, he had not given K.O. the gun and K.O. did not know where the gun was stored. He claimed he just guessed that K.O. could obtain it. At this point the judge excused the jury and admonished Armstrong for being "purposely evasive" and "fooling around" when he actually knew the answers to a lot of the questions. Armstrong stated that he did not shoot the victim and did not meet with defendant to get paid for the murder.

¶ 34    Chicago police officer Mark Reno testified that on March 28, 2013, he was contacted by a detective who asked him to respond to the area of 2445 East 74th Place to retrieve a firearm from a pile of rocks. Officer Reno located a .25 caliber semi-automatic Berretta pistol in the pile. When he recovered the weapon, it had a magazine and was loaded with nine live rounds. Officer Reno photographed it.

¶ 35    Jon Flaskamp, a forensic scientist specializing in firearms ammunition, was qualified as an expert in the field of firearms examination and identification. He examined five fired shell casings and three fired bullets recovered from the crime scene and from the victim's body. He also received and examined the .25 caliber Beretta and the nine unfired cartridges. Flaskamp concluded that the three bullets recovered from the victim's body were fired from the .25 caliber Beretta and the shell cases recovered from the gangway had also been fired from that gun. No DNA or fingerprint analysis was performed.

¶ 36    Chicago police officer Brian Cunningham testified that he responded to the scene of the homicide in the early morning hours of March 2, 2013. Dashawn was placed into custody on March 28, 2013. During processing, Officer Cunningham learned that defendant's cell phone number was xxx-xxx-4816.

¶ 37    Officer Cunningham executed a search warrant for 454 East 95th Street and recovered an

10

owner's manual for a plasma TV, assembly instructions for an entertainment center with a fireplace and refrigerator, and a sales receipt dated March 20, 2013, showing that Dashawn purchased a 2000 Pontiac Grand Prix for $3,500 in cash. The sales receipt listed Dashawn's name, William Strickland, and his phone number, xxx-xxx-7482.

¶ 38    FBI special agent Joseph Raschke, was qualified as an expert in the field of historical cell cite analysis. Agent Raschke testified that he was provided phone records for Armstrong's Sprint phone (xxx-xxx-9797) and defendant's cell phone (xxx-xxx-4816), which Dashawn frequently borrowed.

¶ 39    Agent Raschke utilized "call detail records" to ascertain the date and time of the calls, as well as the numbers for the incoming and outgoing calls. He explained that from 7:20 p.m. on March 1, 2013, to 10:49 p.m. on March 2, 2013, Armstrong's phone used the same tower and sector, which was located several blocks from 7400 South Phillips and was consistent with the phone being used in that area. Armstrong's phone records showed that a call was made to defendant's phone at 9 a.m. on March 2, 2013.

¶ 40    From 7:45 p.m. on March 1, 2013, to 9:01 a.m. on March 2, 2013, Janet's phone, which defendant was using, connected with various cell towers on the south side of Chicago, consistent with Smith's and Stitts' testimony. From 12:41 a.m. to 1:23 a.m. Janet's phone used a cell tower and sector near 454 East 95th Street. From 1:25 a.m. to 2:18 a.m. on March 2, 2013, the phone also utilized a cell tower and sector near 454 East 95th Street. Janet's phone was used to call 911 at 3:30 a.m. After the murder, from 3:44 a.m. to 9:01 a.m., 30 calls were made utilizing the cell tower and sector near the 454 East 95th Street. The phone records also showed that calls were placed from Janet's phone to Armstrong's phone seven times between 7:59 p.m. on March 1, 2013, and 2:18 a.m. on March 2, 2013. Most of those calls were less than one second long.

¶ 41   Detective Cunningham testified that he interviewed defendant on April 14, 2013 and videotaped the interview.  The State played excepts from the video in court.  In the video, defendant acknowledged that Dashawn spoke about wanting to kill William, but she did not believe that he was serious or that he would go through with it.  Dashawn mentioned getting someone to kill William and defendant discouraged him.  A week or two later, Dashawn told defendant that he was going to take William's gun and give it to "a guy" who would kill William.  A day or two before the shooting, Dashawn said, "I'm gonna do this myself," and she told him not to.  She acknowledged being in the car with one of Dashawn's friends but denied having a conversation about killing William.  She denied telling anyone that she would pay to kill William.  Defendant admitted that she had had a discussion with Dashawn shortly before William's death where she told him that she wished William was 'not here."  Defendant also knew that Dashawn had William's gun because he told her he had it.  Dashawn told her that he was going to use William's gun to kill William.  She knew that Dashawn planned to pay Armstrong with the proceeds of William's murder in exchange for the killing.

¶ 42   She also told detectives that she received $578 per month from disability payments.  She knew that William kept $4,000 to $5,000 in the house.  Defendant bought Dashawn a car after William died.  She paid $3,500 for the Grand Prix.  Dashawn bought a new phone, but she did not know where the money came from.  She bought Smith a $110 phone.  Defendant claimed that she ordered the TV and new TV stand before William died.  After William died, she took $14,000 out of her credit union.

¶ 43   The State rested.  Defendant called Sharon Burdette, who was married to defendant's son Clarence.  Sharon testified that William was tight with money but defendant freely spent money and was always very generous.  During the weeks leading up to William's death, Dashawn stated

that he owed William money and that William was demanding his money back. Dashawn felt that he should not have to pay William back, was tired of being "broke" and was going to do whatever he could to make some money.

¶ 44    After hearing the evidence and argument of counsel, the court found defendant guilty of solicitation of murder. She was sentenced to 18 years' imprisonment. This appeal followed.

¶ 45                                    ANALYSIS

¶ 46    Defendant first argues that the State failed to prove her guilty of solicitation of murder beyond a reasonable doubt because her knowledge of Dashawn's plan to kill William did not establish that she commanded, encouraged, or requested that Dashawn kill William, particularly where there was evidence that defendant told Dashawn not to shoot William.

¶ 47    When reviewing the sufficiency of the evidence in a criminal case, we must determine whether, after viewing the evidence in the light most favorable to the State, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *People v. Smith*, 185 Ill. 2d 532, 541 (1999). We will not reverse a criminal conviction unless the evidence is so unreasonable, improbable or unsatisfactory as to create a reasonable doubt of the defendant's guilt. *People v. Rowell*, 229 Ill. 2d 82, 98 (2008). A reviewing court does not retry the defendant or substitute its judgment for that of the trier of fact with regards to the credibility of witnesses or the weight to be given to each witness' testimony. *People v. Jackson*, 232 Ill. 2d 246, 281 (2009). Rather, we "carefully examine the evidence while bearing in mind that the trier of fact is in the best position to judge the credibility of witnesses, and due consideration must be given to the fact that the fact finder saw and heard the witnesses." *People v. Herman*, 407 Ill. App. 3d 688, 704 (2011).

¶ 48    To prove defendant guilty of solicitation of murder under section 8-1(b) (720 ILCS 5/8-1

(b) (West 2012)), the People had to prove beyond a reasonable doubt that defendant: (1) had the intent that the offense of first-degree murder be committed, and that she (2) commanded, encouraged, or requested another person to commit that offense. *People v. Woodard*, 367 Ill. App. 3d 304, 317 (2006). The crime of solicitation of murder is complete when the defendant makes the request for another to commit first degree murder. *People v. Woodard*, 367 Ill. App. 3d 304, 317 (2006), citing *People v. Sims*, 315 Ill. App. 3d 518, 521 (2000).

¶ 49    The testimony at trial established beyond a reasonable doubt that defendant committed the crime of solicitation of murder. Smith testified that she either overheard or was directly involved in several conversations between defendant and Dashawn that were directly about killing William. Smith overheard defendant talk about poisoning William with Dashawn sometime before his murder, although she thought that they were joking. Smith also testified that three days before William's murder, Dashawn told defendant that he planned to convince Armstrong to kill William for them, and that he would use William's gun to do it. Later that day, Dashawn told defendant that Armstrong "was playing" so Dashawn would have to kill William himself. It was only then that defendant said that Dashawn should not kill William. After defendant killed William, Smith saw Dashawn use a phone to call defendant and asked her whether William was dead.

¶ 50    Smith's testimony was substantially corroborated by defendant's interview with the Chicago police. Defendant told the police that she had a habit of going downstairs to where Dashawn was and yelling that she wished that William was dead, and would even directly tell Dashawn that she wanted William to die, even up to one week before William was murdered. Although she initially lied to police, defendant told detectives that Dashawn told her that he planned to hire somebody to kill William on their behalf. The only difference between

defendant's and Dashawn's account of these conversations is that defendant claimed that she discouraged Dashawn's decision to use Armstrong to kill William.

¶ 51   Further circumstantial evidence of defendant's guilt comes from defendant's actions towards Dashawn following William's murder.  After the murder, defendant admitted that she knew that Dashawn murdered William.  She also knew on what day William was going to be murdered and knew that Dashawn was going to use William's gun to commit the murder, which defendant knew Dashawn had access to.  Even knowing all of this, defendant allowed Dashawn to continue to live in her house, lied to the police to protect him and later bought him a $3,500 car.

¶ 52   For a reviewing court to reverse a criminal conviction due to insufficient evidence, the evidence presented must be "so unreasonable, improbable or unsatisfactory as to create a reasonable doubt of the defendant's guilt."  *People v. Rowell*, 229 Ill. 2d 82, 98 (2008).  We find the evidence in this case, when viewed in the light most favorable to the State, supports defendant's conviction for solicitation of murder.

¶ 53   Defendant also argues that despite the evidence, this court should reverse her conviction because Smith's testimony is "self-contradictory," where Smith testified both that Dashawn said that he needed a gun from defendant to give to Armstrong and that Dashawn knew where William's gun was located.  Given the deferential rules of appellate review, we will not reassess the witnesses' credibility and we cannot say that the trial judge's findings are so unreasonable, improbable, or unsatisfactory as to create a reasonable doubt of defendant's guilt. *People v. Wheeler*, 226 Ill. 2d 92, 11-15 (2007).

¶ 54   Defendant next argues that she was denied the right to effective assistance of trial counsel when her attorney conceded the admissibility of statements under the co-conspirator exception

15

to the hearsay rule. During the hearing on the State's motion *in limine* seeking admission of 11 co-conspirator statements, defense counsel conceded that the State alleged sufficient information to render 10 of the statements admissible, but "object[ed] for the record nonetheless." Defendant argues that counsel's concession was inappropriate where the State did not present sufficient evidence independent of the co-conspirator statements to establish a *prima facie* case of conspiracy involving Janet. Defendant acknowledges that she did not include this argument in her post-trial motion, but now attempts to raise the issue couched as an ineffective assistance of counsel claim. We consider her argument nonetheless.

¶ 55    Generally, to show ineffective assistance of counsel, a defendant must establish (1) counsel's representation fell below an objective standard of reasonableness and (2) counsel's alleged deficient performance prejudiced the defense. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). We must show great deference to the attorney's decisions as there is a strong presumption that an attorney has acted adequately. *Id.* at 689. A defendant must overcome the strong presumption that the challenged action or inaction "might have been the product of sound trial strategy." *People v. Evans*, 186 Ill. 2d 83, 93 (1999). Every effort must "be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Strickland*, 466 U.S. at 689. To satisfy the prejudice prong of the *Strickland* test, a defendant must demonstrate a reasonable probability that the outcome of the trial would have been different or that the result of the proceeding was unreliable or fundamentally unfair. *Id.* at 687; *People v. Evans*, 209 Ill. 2d 194, 220 (2004). Such a reasonable probability "is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694.

¶ 56    In this case, for the co-conspirator exception to the hearsay rule as codified in Ill. R. Evid.

801(d)(2)(E) to apply the State was required to prove by preponderance of the evidence that: (1) two or more persons intended to commit a crime; (2) they engaged in a common plan to accomplish the criminal goal; and (3) the act or acts were done by one or more of them in furtherance of the conspiracy. *People v. Batrrez*, 334 Ill. App. 3d 772, 783 (2002). The coconspirator exception to the hearsay rule provides that any declaration by one co-conspirator is admissible against all co-conspirators where the declaration was made during the pendency of and in furtherance of the conspiracy. *People v. Kliner*, 185 Ill. 2d 81, 141 (1998). Statements made in furtherance of a conspiracy include those that have the effect of "advising, encouraging, aiding or abetting its perpetration." *Id*. Statements made after the crime in an effort to conceal the crime or escape punishment further the objective of a conspiracy. *Id*. However, a mere narrative of past occurrences that does not further any objective of the conspiracy is not subject to the coconspirator exception. *Id*.

¶ 57    Here, defense counsel was not ineffective for objecting "for the record" to the State's motion *in limine* where the State clearly proffered *prima facie,* independent evidence of defendant and Dashawn's conspiracy to murder William. The video of defendant's interview with the police established that defendant and Dashawn spoke several times about Dashawn either hiring somebody to kill William or killing William himself.  Defendant admitted that she had had a discussion with Dashawn shortly before William's death where she told him that she wished William was "not here."  Defendant also knew that Dashawn had William's gun because he told her he had it.  Dashawn told her that he was going to use William's gun to kill William. The evidence clearly established that both defendant and Dashawn were frustrated with William because he was frugal.  After Dashawn killed William, defendant gave him several thousand dollars and purchased several pieces of furniture.   This evidence, taken together,

clearly shows that: (1) defendant and Dashawn intended to have William killed, (2) the pair engaged in a plan to either have Armstrong or just Dashawn himself murder William, and (3) Dashawn murdered William in furtherance of this plan. Although the trial court found that the evidence about whether defendant was guilty of conspiracy was "arguable," admissibility of the co-conspirator statements only required that the State to establish *prima facie* evidence of a conspiracy by a preponderance of the evidence, which it unquestionably did. Consequently, we cannot find that defendant received ineffective assistance of counsel.

¶ 58                             CONCLUSION

¶ 59    For the foregoing reasons, we affirm the judgment of the trial court.

¶ 60    Affirmed.